The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, et al., Plaintiffs,

v.

UNITED STATES of America et al., Defendants.

Civ. A. No. 60 C 992.

United States District Court
N. D. Illinois, E. D.
July 3, 1962.

Frank B. Hand, Jr., Washington, D. C., for motor common carrier intervening plaintiffs.

Amos M. Mathews, James W. Nisbet and Ed White, Chicago, Ill., Carl Helmetag, Jr., Philadelphia, Pa., Andrew C. Armstrong, Baltimore, Md., for plaintiff railroads.

Lee Loevinger, Asst. Atty. Gen., James P. O'Brien, U. S. Atty., Chicago, Ill., and Joel E. Hoffman, Atty., Dept. of Justice, for the United States.

Robert W. Ginnane, Gen. Counsel, James A. Murray, Asst. Gen. Counsel, and Betty Jo Christian, Atty., Washington, D. C., for Interstate Commerce Commission.

Before CASTLE, Circuit Judge, and PERRY and ROBSON, District Judges

PER CURIAM.

This action to set aside an order of the Interstate Commerce Commission came on for hearing before this statutory three-judge United States District Court upon plaintiffs' complaint and defendants' answers thereto, and the court having reviewed and considered the record consisting of a certified transcript of the documents and proceedings before the Interstate Commerce Commission (which copy was offered and received in evidence); having heard oral arguments of counsel; and having considered the briefs submitted by counsel, finds the facts and states the conclusions of law as follows:

## FINDINGS OF FACT

1. Plaintiffs are railroad companies. By leave of court the Contract Carrier Conference of American Trucking Associations, Inc., and certain motor common carriers were permitted to intervene on the side of plaintiffs.

2. Defendants named in the complaint are United States of America and the Interstate Commerce Commission. By leave of court, Swift & Company, National Food Stores, Inc., and the Secretary of Agriculture of the United States intervened as defendants.

3. This is an action before a statutory three-judge United States District Court brought under 28 U.S.C. sections 1336, 1398, 2284 and 2321–2325 to set aside an order of the Interstate Commerce Commission entered February 16, 1959, (five Commissioners dissenting) in Ex Parte No. MC–43, Lease and Interchange of Vehicles by Motor Carriers.

4. The Commission's first order in Ex Parte No. MC–43, May 8, 1951, 52 M.C.C. 675, forbade the practice known in the transportation industry as "trip-leasing." A large proportion of the motor vehicle owners engaged in the interstate transportation of property are not subject to the provisions of the Interstate Commerce Act which require the securing of certificates or permits to operate. These may be private carriers who carry their own property in their own vehicles or carriers for hire of exempt agricultural commodities. While the private and exempt carriers may go anywhere, they have often faced the prospect of empty return trips because of inability to obtain loads they may lawfully carry. To avoid empty movements these carriers developed the practice of leasing their vehicle *with a driver* to a fully regulated motor common or contract carrier for one trip in the direction they wished to go. Transportation under the lease was performed in the eyes of the law by the regulated carrier under the authority of his certificate or permit, but the physical movement of the property transported took place in the vehicle owned by the private or exempt carrier and operated by his driver. The regulated carrier paid the owner of the vehicle a portion of freight charges paid by the shipper. American Trucking Associations v. United States, (1953) 344 U.S. 298, 302, 303, 73 S.Ct. 307, 97 L.Ed. 337.

5. Trip-leasing, while not illegal in itself, was productive of violations of the Interstate Commerce Act and of demoralizing economic effects upon the regulated transportation industry. 344 U.S. pp. 303–306, 73 S.Ct. 307. For these reasons, after a long investigation, the Commission forbade trip-leasing by an order requiring that a lease of a vehicle *with a driver* to a regulated carrier must be in writing and for a period of not less than 30 days during which exclusive possession and control must remain with the lessee. 344 U.S. pp. 306–308, 73 S.Ct. 307; 52 M.C.C. 675, 744. This order was sustained in American Trucking Associations, Inc. v. United States, supra, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337.

6. Thereafter various groups favorable to trip-leasing sought legislation by Congress that would deprive the Commission of the power to prohibit the practice. 102 Cong.Rec. 5733. This advocacy brought about enactment on August 3, 1956, of the statute in issue here which goes only so far as to exempt cer-

tain motor vehicle operations from the trip-leasing ban. 70 Stat. 983, 49 U.S.C. A. § 304(e, f), 102 Cong.Rec. 12741-2.

7. Insofar as it is material here, section 304(f) forbids the Commission to regulate the duration of a lease of a motor vehicle, with a driver, to a regulated carrier, if the motor vehicle is owned by a private carrier and is used regularly by the private carrier in the transportation of

"perishable products manufactured from perishable property of a character embraced within section 303 (b) (6) of this title * * *."

Section 303(b) (6) embraces in part the following:

"* * * 'property consisting of ordinary livestock, fish (including shell fish), or agricultural (including horticultural) commodities (not including manufactured products thereof)' * * *."

The issue in this case is whether "ordinary livestock", included in section 303 (b) (6), are "perishable property" within the meaning of section 304(f).

8. Swift & Company, an intervening defendant, carries fresh meat in its own trucks in interstate trips outbound from its packing plants to distributors, and is a private carrier in such operations. During 1957, with the purpose of obtaining inbound return loads, Swift sought arrangements to trip-lease its meat trucks with drivers to a regulated carrier. The Bureau of Motor Carriers of the Commission, by a letter signed by W. Y. Blanning, Director of the Bureau, dated October 3, 1957, advised the regulated carrier that the proposed trip-leasing was not exempted by section 304 (f), stating in part:

" 'Perishable' is construed to mean 'inherently subject to rapid deterioration, decomposition, or decay.' Thus fresh meat fails to qualify under the excepted provision for the reason that the animals from which such meats are produced are not in their natural form considered perishable."

9. On December 20, 1957, Swift & Company filed a petition requesting that the Commission issue a declaratory order, under section 5(d) of the Administrative Procedure Act, 5 U.S.C.A. § 1004 (d), that fresh meat and other perishable meat products are "perishable products manufactured from perishable property of a character embraced within section 203(b) (6)" of the Interstate Commerce Act within the meaning of section 204(f) (1) of the Act.

10. The said petition of Swift & Company alleged that it had been hindered and prevented from trip-leasing its equipment by the existence of Ruling No. 103, Ex Parte MC-43, issued January 24, 1957, by the Bureau of Motor Carriers which ruling, under section 207.-3 entitled "Exemptions" contains the following:

"Question 7. What is the meaning of the language 'perishable products manufactured from perishable property of a character embraced in Section 203(b) (6)' as it is used in the answer to Question 6 above and in Section 204(f) (1) of the Interstate Commerce Act?

"Answer: 'Perishable' is interpreted to mean inherently subject to rapid deterioration, decomposition, or decay. Canned goods, dried dehydrated and preserved goods, bottled goods, and the like, are not perishable products. Frozen goods, or other goods which must be kept under refrigeration to avoid rapid deterioration, decomposition, or decay, are perishable products. To be within the quoted language, the products must themselves be perishable and must be manufactured from property that is both perishable and of the kind embraced in Section 203 (b) (6) of the Act. Thus, perishable products manufactured from fresh fish (including shell fish), from fresh fruits and fresh vegetables, from fresh eggs and fresh poultry, and from other perishable commodities embraced in Section 203(b) (6) of the Act, are within

the quoted language. Products manufactured from grain are not within that language because grain is not perishable. Products manufactured from meat are not within the quoted language because meat is not embraced in Section 203(b) (6) of the Act."

11. Plaintiff railroads and a number of regulated motor carriers replied to Swift's petition asserting that livestock are not perishable property.

12. In its decision of February 16, 1959, the Commission observed that Section 5(d) of the Administrative Procedure Act (pursuant to which Swift's petition was filed) applies only to matters involving adjudication which are required by statute to be determined on the record after opportunity for an agency hearing, and that "rule making proceedings such as the instant one are not such matters." The Commission treated petitioner's pleading "as a petition to determine whether or not its proposed lease of equipment, with drivers, to authorized carriers falls within the exception provided in section 204(f) (1) of the act pursuant to which section 207.4 (a) (3) (i) of our leasing regulations was prescribed," and denied the petition to the extent that it sought relief under the Administrative Procedure Act.

13. By a six to five vote, the Commission held that livestock are perishable property, that Swift, after carrying fresh meat from its packing plants to distributors in its own trucks, may triplease its trucks with drivers to regulated carriers for return hauls, and that to the extent that Administrative Ruling No. 103, Question 7, "implies otherwise, that ruling is disapproved." 79 M.C.C. 65. Petitions by the railroads and regulated motor carriers for reconsideration were denied.

14. In reaching its conclusion the Commission held that the word "perishable" in section 304(f) is ambiguous, and thus subject to construction by resort to legislative history, and that statements made in the Senate and House while the bill was under consideration demonstrated legislative intent that "perishable property" includes livestock. In finding ambiguity the Commission agreed with Swift's contention in this regard which the Commission summarized as follows in its Report:

"In support of its position, petitioner maintains that the word 'perishable' as employed in the section of the act with which we are concerned is ambiguous since it is subject to at least two constructions— the definition adopted by the Bureau in Administrative Ruling No. 103: 'inherently subject to rapid deterioration, decomposition, or decay;' and that found in Webster's New International Dictionary, second edition: 'subject to destruction, death, decay, or deterioration' —and that recourse to the legislative purpose underlying section 204 (f)(1) is necessary in order to resolve the ambiguity.

"In our opinion there is sufficient doubt as to the application of section 204(f) (1) of the act to justify an examination of the history of this legislation. * * * We believe that both these definitions are in common use, that either could properly be applied to the statutory language, and that the intent of Congress in this respect must be determinative."

15. Plaintiffs assert that the Commission erred in holding that "perishable" is ambiguous and in resorting to legislative history for its construction. Plaintiffs aver that "perishable" when used in juxtaposition with "livestock," as here, is an established term of art that excludes "livestock" from its meaning. In amplification they assert that when used in the same statutory setting "perishable property" and "livestock" are mutually exclusive terms of art. They say, therefore, that the Commission was bound to follow these established meanings and could not use legislative history to vary them.

16. Ever since its establishment in 1887 the Commission, in its administration of the Interstate Commerce Act, has treated livestock and perishable property as separate, distinct, and mutually exclusive terms. This separate treatment appears clearly in the Commission's Annual Reports to Congress, in its reports of decisions, and in its digests of decisions.

17. The Annual Reports to Congress, which began in 1887, are made under an 1889 Act, 25 Stat. 862, 49 U.S.C.A. § 21, which requires in part:

"This report shall contain such information and data collected by the Commission as may be considered of value in the determination of questions connected with the regulation of commerce, together with such recommendations as to additional legislation relating thereto as the Commission may deem necessary * * *."

From 1889 to 1931 the Commission included in each Annual Report an index-digest of its decisions for the year. These listed alphabetically and separately, among other items, the subjects "livestock" and "perishable freight." Beginning with 1930 and continuing to date this index-digest, with these same separate listings of "livestock" and "perishables", has been included in Interstate Commerce Acts Annotated, an official Government document, first published in 1930 and consisting now, with supplements, of seventeen volumes.

18. In addition to this index-digest material, the Commission's Annual Reports contain in many years from 1899 to 1959 discussions of problems relating to the transportation of "livestock" and "perishables." These items are always separate and are always set out in such fashion as to show that neither term ever includes the other.

19. For many years the Commission has dealt in its published reports of decisions with controversies and problems relating to the transportation of livestock and perishable freight. In these reports the Commission has always treated the two subjects as separate and distinct categories, and it has never used the term "perishable freight" or "perishables" to include or to mean livestock. In 1918 the Commission issued a 66-page report of an investigation entitled In the Matter of Private Cars, 50 I.C.C. 652, which dealt with regulation of the furnishing of cars by shippers. In seven different pages "perishable freight" problems were considered, and in seven various pages "livestock" problems were discussed, but the two subjects were treated as entirely distinct categories and neither was related to the other in any way. Since 1914 the Commission has issued in different years reports of 20 decisions having the word "livestock" in their titles, and spaced at intervals during the same period it has issued reports of 9 decisions having the words "perishable freight" or "perishables" in their titles. In all of these reports the two subjects are considered and treated as entirely distinct and separate.

20. For more than fifty years Congress has treated "livestock" and "perishable property" as separate and distinct subject matters in legislation. It has never used "perishable property," or any other noun modified by "perishable," or the single word "perishables," as including livestock or live animals.

21. An act of 1910, now 45 U.S.C.A. § 13, permits, as an exception to a general prohibition, the emergency movement of defective cars containing "livestock or 'perishable' freight."

22. In 1921 the Packers and Stockyards Act, Chapter 9 of Title 7 U.S.C.A. §§ 181–231, was enacted. It is devoted chiefly to the regulation of livestock commission agents and meat packers who receive livestock or live poultry from the producers, in order to protect producers from discriminatory or deceptive practices in the sale or handling of their livestock or poultry. The word "perishable" does not appear in the act but the word "livestock" is used many times.

23. In 1927, Chapter 20 of Title 7 U.S.C.A. §§ 491–497 was passed at the request of the Secretary of Agriculture. It established for the producers of "perishable farm products of any kind or character" who ship their products to distributors the same type of protection that the Packers and Stockyards Act provided for growers of livestock, but it did not confer on the Secretary the extensive administrative powers contained in the latter Act. Although Chapter 20 deals with "fruits, vegetables, melons, dairy, or poultry products or any perishable farm products of any kind or character" it has nothing to do with livestock.

24. In 1930, Congress passed the Perishable Agricultural Commodities Act, Title 7, Chap. 20A, U.S.C.A. §§ 499a–499s. It gave the Secretary of Agriculture broad administrative powers over the marketing of perishable agricultural commodities, for the protection of the producers, similar to the powers conferred on the Secretary by Chapter 9 for the benefit of growers of livestock. Chapter 20A, like Chapter 20, has nothing to do with livestock.

25. In 1956, while the trip-leasing bill, S. 898, now section 304(e) (f) of Title 49, was under consideration, Congress had before it simultaneously with S. 898 two bills dealing with "perishable agricultural commodities." Neither of these two bills had anything to do with livestock. One, H.R. 5337, 84th Cong., 2d Sess., was a proposed amendment to Chapter 20A, the Perishable Agricultural Commodities Act, and it was passed. 102 Cong.Rec. 12611, 13569. The other, H.R. 4054, "To encourage the Improvement and Development of Facilities for Handling Perishable Agricultural Commodities," failed to pass after extensive debate. 102 Cong.Rec. 12230, 12746–12750. The trip-leasing bill, S. 898, and H.R. 4054, were both considered and debated in the House on the same days, July 10 and 13, 1956, H.R. 4054 being taken up immediately after S. 898 on both days. 102 Cong.Rec. 12230–12231, 12741–12750. The Senate amended and passed H.R. 5337 on July 13 and the House concurred on July 19, 1956. 102 Cong.Rec. 12611, 13569. The Senate concurred in the House amendment to S. 898 on July 25, 1956. 102 Cong. Rec. 14373–14374.

26. Congress has defined agricultural products as including livestock and other live animals, but Congress has never used the word "perishable" in a description or definition of livestock or live animals; and where Congress has used "perishable" it has always been employed to define something other than livestock or live animals. Thus livestock is included in the definition of "agricultural products" in sections 451 and 1626 of 7 U.S.C.A., and certain fur-bearing animals are defined as "agricultural products" in section 433(b). "Perishable agricultural commodities" are defined in section 499a(4) of Title 7, and "perishable farm products of any kind or character" are referred to in section 491, but neither section relates in any way to livestock.

## CONCLUSIONS OF LAW

 1. The Commission urges at the outset that the construction of a statute by the administrative body charged with its enforcement is entitled to special weight but that principle does not apply where, as here, the Commission's interpretation is not based in any wise upon its own accumulated knowledge and experience but only upon a reading of the dictionary and the Congressional Record, tools which a court is equally able to use. Federal Communications Commission v. RCA Communications, 346 U.S. 86, 91, 96, 73 S.Ct. 998, 97 L.Ed. 1470. Moreover, since the Commission's own explanation is that it proceeded from doubt as to the validity of the ruling of its Bureau of Motor Carriers, and that it turned therefrom to aids not specially related to its own expertise, this explanation alone deprives the Commission's interpretation of any force. De Sylva v. Ballentine, 351 U.S. 570, 577–578, 76 S.Ct. 974, 100 L. Ed. 1415. Finally, the Commission here

for the first time has adopted a view that is antagonistic to the construction which it had followed for the previous seventy years of its lifetime. In such a case the new interpretation is entitled to no weight as an administrative determination. United States v. Leslie Salt Co., 350 U.S. 383, 396, 76 S.Ct. 416, 100 L.Ed. 441.

2. The long continued and unvarying practices of the Commission and of Congress in treating "livestock" and "perishable property" (or any other noun modified by the word "perishable") as separate, distinct, and mutually exclusive terms, has imparted to these terms, particularly when used in juxtaposition in the same statutory setting, the character of terms of art. In such a setting, exemplified here in the relation between sections 304(f) and 303(b)(6), the words "perishable property" are terms of art that exclude "livestock" from their meaning, and, conversely, "livestock" is a term of art that is not embraced in the words "perishable property." Morissette v. United States, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288; Case v. Los Angeles Lumber Products, Ltd., 308 U.S. 106, 115, 60 S.Ct. 1, 84 L.Ed. 110; O'Hara v. Luckenbach Steamship Company, 269 U.S. 364, 371, 46 S.Ct. 157, 70 L.Ed. 313.

3. In the Morissette case, supra, the Court said (342 U.S. p. 263, 72 S.Ct. p. 249):

"And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them."

The Court used similar words in Case v. Los Angeles, etc., supra (308 U.S. p. 115, 60 S.Ct. p. 7):

"The words 'fair and equitable' as used in § 77B(f) are words of art which prior to the advent of § 77B had acquired a fixed meaning through judicial interpretations in the field of equity receivership reorganizations. Hence, as in case of other terms or phrases used in that section, Duparquet Huot & Moneuse Co. v. Evans, 297 U.S. 216 [56 S.Ct. 412, 80 L.Ed. 591], we adhere to the familiar rule that where words are employed in an act which had at the time a well known meaning in the law, they are used in that sense unless the context requires the contrary. Keck v. United States, 172 U.S. 434, 446 [19 S.Ct. 254, 43 L.Ed. 505]."

The context of the statute, its entire wording and its relation to the text of other statutes, does not call for any interpretation different from the meaning imparted to the words in question by their long legislative and administrative construction. There is no "contrary direction" in the statutory words. And this construction is entirely harmonious to the two sections in that there are many items of "perishable property" that are "embraced within section 303 (b) (6)" to which section 304(f) may apply, such as "fish (including shell fish), or agricultural (including horticultural) commodities." See Bureau of Motor Carriers Ruling No. 103, Question 7, *supra*.

4. In construing the words "perishable property" in section 304(f) the Commission was bound as a matter of law to follow the meaning this phrase had acquired as a term of art, particularly since its own lifetime seventy years of construction had contributed to that meaning. The Commission was not free to depart from its own long and unvarying construction. United States v. Leslie Salt Co., supra, 350 U.S. 383, 396, 76 S.Ct. 416, 100 L.Ed. 441. If the Com-

mission had relied upon its own accumulated store of experience and its own history of interpretation it could not have failed to hold that "perishable property" did not mean or include livestock, as, indeed, five of the eleven members of the Commission did hold. The ambiguity which the Commission professed to find was not a real ambiguity at all, since an entirely clear and non-ambiguous construction, a construction that excluded any other, a construction of the Commission's own making powerfully supported by fifty years of Congressional construction, was immediately at hand for precise application in this case.

■ 5. In view of the meaning of "perishable property" as a term of art that does not include livestock, and in view of the further consideration that the Commission by reason of its own long interpretation of the phrase was not faced with a problem of ambiguity at all, the Commission erred in consulting the legislative history of section 304 (f). Under these circumstances legislative history may not be consulted to change the plain meaning of words thus established. Packard Motor Co. v. National Labor Relations Board, 330 U.S. 485, 492, 67 S.Ct. 789, 91 L.Ed. 1040; Gemsco v. Walling, 324 U.S. 244, 260, 65 S.Ct. 605, 89 L.Ed. 921; Ex parte Collett, 337 U.S. 55, 61, 69 S.Ct. 944, 93 L. Ed. 1207; Unexcelled Chemical Corp. v. United States, 345 U.S. 59, 64–65, 73 S.Ct. 580, 97 L.Ed. 821; United States v. Oregon, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575. In the Packard Motor case the problem was whether the word "employee" included foremen. In holding that it did by reason of long custom and usage, and in refusing to look at the legislative history, the Court said (330 U.S. p. 492, 67 S.Ct. p. 793):

"We are invited to make a lengthy examination of views expressed in Congress while this and later legislation was pending to show that exclusion of foremen was intended. There is, however, no ambiguity in this Act to be clarified by resort to legislative history, either of the Act itself or of subsequent legislative proposals which failed to become law."

In the Unexcelled Chemical case the Government urged that unless the meaning conveyed by legislative history were followed the words used in a statute would produce a result plainly contrary to that intended by Congress. As to this the Court said in part in refusing to resort to legislative history (345 U.S. pp. 63–65, 73 S.Ct., pp. 582–583):

"We do not stop to lay out the entire legislative history of the Portal-to-Portal Act. For the words Congress used in § 6 are too precise for extended argument. * * * It is not for us then to try to avoid the conclusion that Congress did not mean what it said. Arguments of policy are relevant when for example a statute has an hiatus that must be filled or there are ambiguities in the legislative language that must be resolved. But when Congress, though perhaps mistakenly or inadvertently, has used language which plainly brings a subject matter into a statute, its word is final * * *."

There is of course no occasion here to consider whether Congress used language mistakenly or inadvertently.

■ 6. The defendants urge that even if the term "perishable property" be found free from ambiguity, that would not prevent looking to legislative history for light on the meaning of the term. In the circumstances of this case that contention is without merit. The authorities cited above show clearly that there is a well established rule against resort to legislative history where, as here, Congress has employed a term of art which is the product of a long and unvarying course of administrative and legislative construction. The cases cited by defendants do not support their position. Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 348 U.S. 437, 75 S.Ct. 488, 99 L.Ed. 510, upon which they heavily

rely, is not an opinion of the Court but is a separate opinion of three justices in which five refused to join (pp. 439, 461, 465, 75 S.Ct. 488), one not participating. Even more significant is the fact that the principle which the minority opinion apparently asserts, unrestricted resort to legislative history regardless of how clear the statutory language may be, has appeared in three dissenting opinions since the Westinghouse case was decided and not elsewhere. See Commissioner of Internal Revenue v. Acker, 361 U.S. 87, dissent at 94, 80 S. Ct. 144, 4 L.Ed.2d 127; Massachusetts Bonding & Insurance Co. v. United States, 352 U.S. 128, dissent at 138, 77 S.Ct. 186, 1 L.Ed.2d 189; Mastro Plastics Corp. v. National Labor Relations Board, 350 U.S. 270, dissent at 289, 293, 76 S.Ct. 349, 100 L.Ed. 309. Defendants' other authorities dealt either with ambiguous words or special situations in which the words are admittedly not terms of art.

7. Definitions of "perishable" found in dictionaries and in court decisions not construing the statutes cited above are not relevant. The question here is the construction of words in the Interstate Commerce Act, and no interpretation of that Act and no administrative practice by the Commission have been cited that are contrary to the Commission's long continued construction that "livestock" and "perishable property" are mutually exclusive terms. Nor has any legislation by Congress been cited that is inconsistent with the long course of Congressional legislation that follows the same principle. It is this Commission and Congressional action that is relevant; any decisions or definitions not within the scope of that action have no bearing upon the issue here involved.

8. The defendants assert that the phrase in section 304(f), "perishable property" is not the equivalent of the words in various statutes and Commission reports and decisions such as "perishables" and "perishable freight" and "perishable farm products" and "perishable agricultural commodities," all of which have been distinguished from livestock by the Commission and by Congress. Obviously, however, it is the word "perishable" that is important; it is the modifier "perishable" that sets the modified noun apart from livestock, and the use of the collective noun "perishables" accomplishes the same result. Moreover, "freight" and "farm products" and "agricultural commodities" are all "property." The phrase in section 304 (f), "perishable property of a character embraced within section 303(b) (6)" was of course used to refer to the word "property" in section 303(b) (6) describing the "property" covered by 303(b) (6). The words "freight" and "property" as used in the Interstate Commerce Act are interchangeable. Interstate Commerce Commission v. Southern Pacific Co., 132 F. 829, 838–839 (S.D.Cal.), reversed on other grounds, 200 U.S. 536, 26 S.Ct. 330, 50 L.Ed. 585. The words "property" and "freight" and "commodities" are frequently used in the same sections of the Act to mean the same thing.

9. Related to the foregoing is the defendants' argument that the reason that livestock are not covered by the statutes dealing with "perishable agricultural commodities" and "perishable farm products" may be that livestock are not considered "agricultural commodities" or "farm products." That argument is answered by the fact that the statutes which define "agricultural products," unmodified by "perishable" include livestock in the definition (7 U.S.C.A. §§ 451, 1626), whereas the statutes that use the modifier "perishable" with equivalent phrases do not include livestock. Again, it is not the particular noun that is important; it is the modifier "perishable" that excludes livestock. Section 303(b) (6) lists as exempt commodities "ordinary livestock * * * or agricultural (including horticultural) commodities (not including manufactured products thereof)." The purpose of Congress in listing livestock specifically, according to the Commission, was to avoid exempting fresh meat on the theory that it is an agricultural commodity. East Texas

Motor Freight Lines v. Frozen Food Express, 62 M.C.C. 646, 648.

10. Defendants suggest that even if the Commission erred in consulting legislative history, or if the legislative history does not support its conclusion, nevertheless the Commission may be sustained on the ground that in any event it chose the right meaning for "perishable property." There are two faults in that. Absent legislative history, the only meaning open and which the Commission could be expected to use is that followed by the Commission throughout its lifetime; the reason that recourse to legislative history was improper was the existence of that well established meaning. Independently of the foregoing, the Court is limited to a review of the Commission's express holdings; we cannot sustain the construction of the statute upon the basis of an interpretation on which the Commission did not rely in its report and which it conceivably might not have used. American Trucking Associations v. United States, 364 U.S. 1, 15–17, 80 S.Ct. 1570, 4 L.Ed.2d 1527.

11. Plaintiffs are parties in interest with standing to maintain this action. Some of them have participated as active parties throughout the proceedings before the Commission in Ex Parte No. MC–43, including the phase in which the order under review was entered. All are regulated carriers for hire of fresh meat and other perishable packinghouse products manufactured from livestock. They have lost and are continuing to lose substantial amounts of traffic in these commodities to private carriers. Annual Report of the Commission for 1956 p. 1; Annual Report 1957 p. 4; Annual Report 1958 p. 2; Annual Report 1960 p. 2. One of the economic evils intended to be overcome by the trip-leasing ban was the destructive effect upon common carriers of the competition of private carriers whose competitive power was enhanced by their ability to enter and leave for-hire status at will by trip-leasing. American Trucking Associations, Inc. v. United States, supra, 344 U.S. pp. 304, 312–313, 318, 73 S.Ct. 307. Since the Commission's erroneous construction of the statute authorizes unlawful transportation by private carriers, plaintiffs have standing to sue to the end that the Commission may be guided in the future by the Court's construction of the act. Alton Railroad Co. v. United States, 315 U.S. 15, 18–19, 62 S.Ct. 432, 86 L.Ed. 586; American Trucking Associations, Inc. v. United States, supra, 364 U.S. 1, 17–18, 80 S.Ct. 1570, 4 L.Ed.2d 1527.

12. Since the Commission erred in holding that the words "perishable property" as used in section 304(f) are ambiguous, erred in resorting to legislative history for construction of those words, and erred in holding that those words include in their meaning the term "ordinary livestock" in section 303(b) (6), the order must be set aside, its enforcement permanently enjoined, and the matter should be remanded to the Commission.