The **ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY** et al., Plaintiffs,

v.

**UNITED STATES** of America and Interstate Commerce Commission, Defendants.

Civ. A. No. 64 C 1442

United States District Court
N. D. Illinois, E. D.

Aug. 20, 1965.

⌖85.4

Amos M. Mathews, J. D. Feeney, Robert F. Munsell, Chicago, Ill., Thormund A. Miller, Washington, D. C., for plaintiffs.

Bruce E. Brown, Chicago, Ill., Francis M. Shea, William H. Dempsey, Jr., Walter J. Myskowski, W. Graham Claytor, Jr., William D. McLean, James A. Bistline, Washington, D. C., Shea & Gardner, Washington, D. C., of counsel, for Southern R. Co., et al., intervening plaintiffs.

John A. Daily, New York City, Louis T. Duerinck, Chicago, Ill., for New York Cent. R. Co., intervening plaintiff.

A. L. Foster, C. P. Callahan, Jr., Chicago, Ill., Paul R. Duke, Philadelphia, Pa., for Eastern Railroads, intervening plaintiffs.

Kenneth F. Burgess, D. Robert Thomas, Chicago, Ill., George H. Leonard, F. N. Melius, Jr., New York City, Theo. R. Schneider, St. Louis, Mo., Giles Morrow, Washington, D. C., Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel, for Acme Fast Freight, Inc., et al., intervening plaintiffs.

James W. Hoeland, Louisville, Ky., H. R. Begley, Chicago, Ill., for Atlanta & West Point R. Co. et al., intervening plaintiffs.

Nicholas deB. Katzenbach, U. S. Atty. Gen., William H. Orrick, Jr., Asst. U. S. Atty. Gen., I. Daniel Stewart, Jr., Washington, D. C., Edward V. Hanrahan, J. B. Schmetterer, Chicago, Ill., for United States of America.

Robert W. Ginnane, Robert S. Burk, Washington, D. C., for Interstate Commerce Commission.

Clarence D. Todd, Washington, D. C., Joseph M. Scanlan, Chicago, Ill., Todd, Dillon, Sullivan & Raley, Washington, D. C., of counsel, for Contract Carrier Conference of American Trucking Ass'n, Inc., intervening defendant.

Richard R. Sigmon, Peter T. Beardsley, Harry J. Jordan, William R. Rubbert, F. G. Freund, R. Edwin Brady, Bryce Rea, Jr., Roland Rice, Homer S. Carpenter, John S. Fessenden, James E. Wilson, Washington, D. C., Guy H. Postell, Atlanta, Ga., Ferdinand Born, Indianapolis, Ind., George D. Michalson, Kansas City, Mo., Herman Matthei, Boston, Mass., Robert Gawley, Buffalo, N. Y., LeGrand A. Carlston, Denver, Colo., F. H. Lynch, Jr., Dallas, Tex., Carl L. Steiner, Axelrod, Goodman & Steiner, Chicago, Ill., of counsel, for American Trucking Ass'ns, Inc., et al., intervening defendants.

Joseph M. Scanlan, Chicago, Ill., George S. Dixon, Detroit, Mich., Matheson, Dixon & Bieneman, Detroit, Mich., of counsel, for National Automobile Transporters Ass'n, intervening defendant.

Before CASTLE, Circuit Judge, and HOFFMAN and DECKER, District Judges.

JULIUS J. HOFFMAN, District Judge.

■ Piggyback service—the movement of highway trailers on railroad flatcars—constitutes "probably the most significant recent devolopment in transportation", in the opinion of the Interstate Commerce Commission. Because of the "explosive growth" of this service in the past five years, the Commission in 1962 instituted on its own motion a proceeding to investigate the subject generally and "to explore new approaches" to its regulation. That proceeding culminated in a Report and Order of the Commission issued under the title *Substituted Service—Charges and Practices of For-Hire Carriers and Freight Forwarders (Piggyback Service)*, Ex Parte No. 230, reported at 322 I.C.C. 301–417, dated March 16, 1964, rehearings denied June 22, 1964, and December 21, 1964. By this Report and Order, the Commission promulgated eight rules intended to regulate trailer-on-flatcar (TOFC) service. These Rules, herein referred to simply as Rules 1 through 8, are officially designated and reported as sections 500.1 through 500.8 of title 49, Code of Federal Regulations.

This suit was brought to enjoin and set aside the Commission's order on the ground that four of the eight rules issued by the Commission are beyond its authority and unlawful.[1] Pursuant to Sections 2284 and 2321 through 2325 of the Judicial Code,[2] the matter has been tried before a three-judge court. We conclude that the Commission's order must be set aside.

## I.

The plaintiffs and intervening plaintiffs are aligned as five separate parties in interest, comprising three groups of railroads, one railroad individually, and a group of freight forwarders. For the defense, the American Trucking Associations, Inc., and some of its members, the Contract Carrier Conference, and the National Auto Transporters Association all intervened to join as defendants with the Commission and the United States. Despite this multiplicity, the several

---

1. A motion for a temporary restraining order was withdrawn when the Commission, on its own motion, stayed the effectiveness of its rules until further order.

2. 28 U.S.C. §§ 2284, 2321–2325 (1948).

plaintiffs are agreed on the main point of the railroads' controversy with their rivals, the truckers, and in their objections to the Commission's new rules.

 The primary issue to be decided is the validity of Rules 2 and 3, promulgated by the Commission in its proceeding by a divided vote. Briefly glossed, they require a railroad which offers TOFC service on an open-tariff basis, that is, to the regular shipping public, to make that service available on the same terms without discrimination to motor carriers[3] acting in that capacity in hauling freight, and, as a corollary, authorize the motor carriers to substitute this TOFC service of the railroads for their regular highway transportation by truck. In full, these rules provide:

500.2 *Availability to all of TOFC service.*—TOFC service, if offered by a rail carrier through its open tariff publications, shall be made available to any person at a charge no greater and no less than that received from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions.

500.3 *Use of open-tariff TOFC service by motor and water carriers in the performance of economically regulated transportation.*—

(*a*) Except as otherwise may be prohibited by these rules, motor common and contract carriers, water common and contract carriers, and freight forwarders may utilize TOFC service in the performance of all or any portion of their authorized service through the use of open-tariff TOFC rates published by a rail carrier.

(*b*) Motor and water common carriers shall utilize open-tariff TOFC service only if their tariff publications give notice that such service may be utilized at their option, but that the right is reserved to the user of their services to direct that in any particular instance TOFC service shall not be utilized.

(*c*) Motor and water contract carriers shall utilize open-tariff TOFC service only if their transportation contracts and schedules make appropriate provision therefor.

(*d*) Tariffs of motor and water common carriers and contracts and schedules of motor and water contract carriers providing for the use of open-tariff TOFC service shall set forth the points between which TOFC service may be performed and the names of the rail carriers whose TOFC service may be utilized.

(*e*) Motor and water common and contract carriers utilizing open-tariff TOFC service in the performance of authorized transportation shall tender traffic to and receive traffic from rail carriers only at points which the motor and water carriers are authorized to serve.

These Rules break new ground. To the present time, the available TOFC service has been divided among five categories or "plans" which have evolved from the carriers' practices and the Commission's rulings. As capsulized in the Commission's Report, the five plans involve the following arrangements:

### PLAN I

Railroad movement of trailers or containers of motor common carriers, with the shipment moving on one bill of lading and billing being done by the trucker. Traffic moves

---

3. These Rules apply equally to the use of railroad TOFC service by common and contract carriers by water, as by motor vehicle. Since the issues are largely identical, they will be considered by reference only to motor carriers except where different legal principles apply to water carriers. So-called fishyback service—the movement of highway trailers by barge—was severed from this proceeding for separate treatment, as were the practices of motor carriers of automobiles. Birdyback service is not involved.

under rates in regular motor carrier tariffs.

## PLAN II

Railroad performs its own door-to-door service, moving its own trailers or containers on flatcars under tariffs usually similar to those of truckers.

## PLAN III

Ramp-to-ramp rates based on a flat charge, regardless of the contents of trailers or containers, usually owned or leased by freight forwarders or shippers. No pickup or delivery is performed by the railroad.

## PLAN IV

Shipper or forwarder furnishes a trailer or container-loaded flatcar, either owned or leased. The railroad makes a flat charge for loaded or empty-car movement, furnishing only power and rails.

## PLAN V

Traffic moves generally under joint railroad-truck or other combination of coordinated service rates. Either mode may solicit traffic for through movement.

■ It will be seen that these five plans can be classed more simply into two groups: the open-tariff plans, numbered II, III, and IV, available equally to regular shippers and freight forwarders, but not to motor carriers; and the joint intermodal plans, numbered I and V, available only to common carriers, and only through negotiation and voluntary agreement between the rail carrier and the motor carrier. Thus motor carriers and ordinary shippers are differently served under separate plans. Negatively, this separation has foreclosed motor common carriers from the use of the three open-tariff plans. The prohibition implicit in the plans was explicitly declared by the Commission a short while after motor carriers first were brought under feder-

al regulation.[4] Since 1939, this ruling has been reaffirmed in subsequent decisions and observed in practice consistently down to the present time.[5] The established principle and its supporting reasons have come to be summed up in the abbreviated statement that it is repugnant to the Interstate Commerce Act for a motor carrier to act both as a carrier and a shipper as to the same shipment.

The new Rules promulgated by a majority of the Commission would work an abrupt departure from this established principle and from the settled practice. Since joint intermodal service of the kind provided by plans I and V would be continued under new Rule 4, (49 C.F.R. 500.4), the motor common carrier would enjoy the option of both classes of TOFC service, and could choose either open-tariff service without the railroad's consent or concurrence if that rate should be more favorable, or the joint intermodal service if the railroad in negotiation should agree to offer that at a lower rate. The railroads, presently free to bargain with their highway competitors, would be bound to accept whatever TOFC freight their rival carriers might choose to tender. These basic changes in the industry are not, however, inadvertent. The Commission plainly avowed its purpose as "the reexamination of existing Commission precedents and pronouncements" and it specifically overruled those prior decisions which it found to be indistinguishable and absolutely irreconcilable with its newer view. The issue of power is thus clearly drawn.

## II.

■ In reviewing the authority of the Commission to issue the Rules in question, we are confronted at the outset by the duty to measure the administrative action solely against the statutory grounds invoked by the agency. In the exercise of judicial review, a court is not at liberty to seek its own justification for

4. Substituted Freight Service, 232 I.C.C. 683 (1939).

5. See Movement of Highway Trailers by Rail, 293 I.C.C. 93 (1954), and cases there cited.

the Commission's order or to accept appellate counsel's *post hoc* rationalizations.[6] The Commission bears a correlative duty to disclose clearly the grounds on which it acts.[7]

Here we cannot say that the Commission's Report is a model of clarity, guiding the court unerringly to the statutory source of the power relied upon. The Rules are described in the Report as partly interpretive, partly imposing billing and tariff requirements, and partly "to implement the broad provisions of existing legislation", without specification of which ground supports any particular rule. In overruling its earlier decisions which prohibited motor carriers from shipping their customers' goods by rail, the Commission "does not doubt that when made they represented sound conclusions." The decisions are now regarded, however, as "incorrect in the light of this record and current conditions." The observation suggests that the Commission now regards itself as vested with a sweeping power to make quasi-legislative rules which it deems appropriate to carry forward the broad policies of the act of Congress, although it declared at an earlier day that "We are invested with no roving commission to carry out the policy of Congress * * *."[8]

It is unnecessary to decide, however, whether the power delegated in Section 12 of the Interstate Commerce Act, authorizing the Commission "to execute and enforce the provisions" of the Act, confers such a general power to make rules to meet changed conditions. The Rules in question here must stand or fall with the interpretation of the Act itself, regardless of altered circumstances in the transportation industry. On one hand, Rules 2 and 3 are simply declaratory of the command of Congress if the Commission is correct in construing the Act to forbid railroad discrimination against motor carriers in the services afforded, and in interpreting the Act as imposing no limits on the power of a motor carrier to avail itself of substituted rail service in its authorized operations. On the other hand, the Rules are invalid as in conflict with the Act, despite changed conditions, if the congressional enactment is read to excuse the railroads from a duty to serve motor carriers equally with ordinary shippers, or to limit the authority of motor carriers to ship their customers' freight by rail without the railroads' concurrence.

We turn first, then, to the interpretation of the relevant statutes, upon the Commission's assumption that the questions are open and may be treated as matters of first impression. We will thereafter consider the effect of the settled line of decision establishing an interpretation contrary to the Commission's revised views.

### III.

The only statute mentioned in the Commission's report which could supply affirmative support for Rules 2 and 3 is Section 2 of the Interstate Commerce Act.[9] Indeed, in considerable part the Commission's Rule 2 is merely a paraphrase of that Section. We may accept, therefore, the argument of counsel for the government, despite the ambiguity of the Report's reference and discussion, that the Commission invoked Section 2 as authority for its Rules.

Section 2 provides in full:

That if any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or

6. Burlington Truck Lines v. United States, 371 U.S. 156, 168–169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); Atchison, Topeka and Santa Fe Ry. v. United States, 209 F.Supp. 35, 45 (N.D.Ill.1962).

7. Securities and Exchange Commission v. Chenery Corporation, 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943); Au-

tomatic Canteen Company of America v. Federal Trade Commission, 346 U.S. 61, 81, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953).

8. Kansas City Southern Ry. Co. v. Kansas City Terminal Ry. Co., 211 I.C.C. 291, 304 (1935).

9. 49 U.S.C. § 2 (1887).

receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful.

■ By its terms, this Section deals only with discrimination in rates, and does not extend to a discriminatory refusal to provide service at all. This limitation in scope is not a legislative oversight, however. The next succeeding section of the Act rounds out the carrier's duty of equal treatment, by forbidding discrimination or preferences in the service afforded, in the following terms:

Section 3(1). It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: *Provided, however,* That this paragraph shall not be construed to apply to discrimination, prejudice, or dis-

advantage to the traffic of any other carrier of whatever description.

■■ It appears, then, that the letter of the law singled out by the Commission as authority for its Rules offers no support, since the ostensible object and effect of those Rules is not to eliminate discrimination in rates under Section 2, but rather to compel the railroads to afford TOFC service to motor carriers if it is provided for others. The provision relevant to this purpose, Section 3, is nowhere cited in the Commission Report. This flaw might not be fatal if Section 3 provided the necessary foundation, since the two sections are plainly complementary and to be read *in pari materia.* But Section 3, by its proviso, specifically excludes from its coverage "the traffic of any other carrier of whatever description."

Endeavoring to avoid the plain meaning of this proviso, the government relies upon a portion of its complex legislative history. The proviso was enacted in 1940, when it was adopted from a parallel provision of part II of the Interstate Commerce Act, dealing with motor carriers, which had been enacted in 1935.[10] Tracing to this source, the government points to a statement of Senator Wheeler, made in explanation of the language as used in this earlier bill, tending to show that the proviso was intended to allay fears that carriers by competing modes might complain of injury by reason of the low rates of the rival.[11] The Senator expressed his opinion that the fears were not well founded, however, because the basic command of the section had in turn been borowed from Section 3 of part I (applicable to railroads) as originally enacted *without* the proviso, and because that section had "always been interpreted as covering unequal and unjust treatment by a carrier of its patrons." Reading "patrons" as including carriers who tender freight for shipment, the government's argument proceeds from this observation

---

10. Section 216(d), 49 U.S.C. § 316(d) (1935).

11. 79 Cong.Rec. 5656.

through the tangle of cross-references to the conclusion that Section 3 *does* protect carriers who seek to use another carrier's services since it is said that the proviso exempts only discrimination against the traffic of other carriers competing on parallel routes for the same business. The plaintiffs point out in response that Senator Wheeler was contrasting "patrons" with "carriers" in his remarks, so the government's major premise—that carriers are "patrons" in the Senator's thinking—is faulty.

At best this legislative history is inconclusive. It seems clear that the Senator did not have in contemplation the status of the carrier that tenders freight to another, and that his comments on this different bill provide only oblique evidence of the meaning of the basic provisions of Section 3(1), which had been enacted nearly fifty years earlier, or of the meaning of its proviso, enacted by another Congress five years later. This evidence of congressional intent is too slender a reed to support a disregard of the broad sweep of the words excluding from the railroad's obligation of equal service "the traffic of any other carrier of whatever description."

Practical problems which would arise under the Commission's interpretation of Section 2 also militate against such a reading. Although the Report emphasizes the value of *coordinated* service by motor carriers and railroads, the Rules promulgated would allow the motor carrier to use any open-tariff TOFC plan, including plan II as well as plan III. Under plan II there is no coordination: the railroad provides complete door-to-door service, with its own tractors and trailers. Thus the motor carrier in using it would abandon any pretense of performing services as a carrier, and would function merely as the customer's agent in calling upon the railroad for its services. Moreover, if the Act required railroads to serve motor carriers and regular shippers without discrimination, there would be no warrant for confining the command to TOFC service. The trucker would be entitled to compel the railroads to carry not only the freight-laden trailer but bulk cargo and boxcar freight as well. The Rules announced limited as they are to TOFC shipment, would fall far short of the need for guidance were the noval interpretation of the Act to be sustained; the greater need would be for rules to govern the problem of handling freight in other forms. And since Sections 2 and 3 of the Act apply to the transportation of passengers as well as freight, the Commission's interpretation would open a host of new problems concerning substituted service for passengers. Moreover, the Commission's view of the Act would appear to require intramodal substituted service, as pointed out by Commissioner Webb in his dissent, by which one railroad could shunt its unprofitable traffic onto a competing railroad, or by which one motor carrier could call upon another for the difficult hauls. Pressed to its logical ultimates, the Act, in the Commission's reading, would permit a carrier which had received freight from another to exercise the same right by tendering the same freight immediately back to the original carrier. Such examples, while remote, are not too extravagant to cast doubt on the validity of the Commission's construction of the Act.

An additional anomaly lies in the fact that the Commission's own Rules would appear to offend against its interpretation of Section 2. While motor carriers could demand TOFC service at the open-tariff rates offered to regular shippers, they would still be authorized to enter into agreements with rail carriers for joint intermodal service under Commission Rule 4, at rates fixed by private negotiation and contract. The choice would seem to be inconsistent with the Commission's own justifying principle as declared in its Rule 2, that TOFC service should "be made available to any person at a charge no greater and no less than that received from any other person * * *." The effort to achieve equality rather produces a new inequality, since at least under the present practices carriers and shippers are sepa-

rately served, each group at its own price. How far the Rules fall short of the announced objective of equal charges for all TOFC service is emphasized by the Commission's rejection of two proposed rules which would have fixed the open-tariff rate as the maximum rate which the railroad might receive through private agreements for joint intermodal service, and which would have required the railroads to treat all motor carriers equally, as to services and rates, in its agreements for such joint intermodal service.[12] If the Commission were correct in its view that carriers and regular shippers are equally "persons" within the meaning of Section 2 of the Act, then that statutory prohibition against a railroad's receiving "from any person or persons a greater or less compensation for any service rendered" than from another, "by any special rate * * * or other device," would seem to require not only that carriers be treated as well as shippers, but that shippers be treated as well as carriers, and each carrier as well as any other.

In still another aspect, the Commission's Rules countenance an apparent discrimination which may be difficult to reconcile with the interpretation of Sections 2 and 3 of the Act as fully applicable to motor carriers shipping their customers' goods by rail. By its Rule 3, the Commission permits motor common carriers to utilize open-tariff TOFC service only between points on their authorized routes, and to tender traffic to railroads, or receive it from them, only at points which the motor carriers are authorized to serve. Under Rule 5, motor common carriers are subjected to still another limitation, prohibiting the use of open-tariff TOFC as a means to serve by direct route points which the motor carrier is authorized to serve only indirectly and circuitously, by combining route authorizations for other points. Since ordinary shippers are subject to none of these limits, the Rules do not achieve that equality of service which the Commission would require from its reading of Section 2. The answer, of course, lies in the fact that a motor carrier which makes use of open-tariff TOFC service is not merely an ordinary shipper, but is still a carrier subject to all limits imposed by law on its authority. The Commission itself thus recognizes that carriers and shippers are not equally and indiscriminately "persons" entitled to the same service at the same rates under Sections 2 and 3 of the Act.

## IV.

While we have concluded that the Rules in question are not authorized in their affirmative commands by Sections 2 and 3 of the Interstate Commerce Act, properly interpreted, there is a related but independent ground under which these Rules must fall. Even if the Act specifically commanded the railroads to serve motor carriers and ordinary shippers without discrimination, there would remain the question whether the motor carriers could lawfully avail themselves of that service without violating their contracts with customers or exceeding the rights conferred by the certificate of public convenience and necessity which authorizes their operations. In other words, we are bound to consider the statutes regulating the operations of motor carriers as well as those imposing obligations upon the railroads.

The internal structure of the Interstate Commerce Act itself bears evidence of the limited authority conferred on the carrier. Each mode of transportation is the subject of a separate formal part of the Act: part I deals with rail carriers; part II with carriers by motor vehicle; part III with carriers by water; and part IV with freight forwarders. The certificate of public convenience and necessity or license appropriate for each mode of transportation is, by its terms and by the internal logic of the legislation, confined to transportation by that mode. Thus the certificate issued to a motor carrier constitutes a formal de-

12. The proposed rules, distributed in the initial stages of the proceeding, are set forth, and rejected, at 322 I.C.C. 328.

termination of the public need for motor transportation, regardless of the availability of other modes, and authorizes the holder to engage in for-hire transportation by "motor vehicle", not by rail or other modes, and on the "public highway".[13]

When operation by another mode is permissible, specific legislative exceptions have been created. Thus freight forwarders under part IV are specifically authorized to ship goods by means of common carriers governed by other parts of the Act.[14] Such special exceptions mirror the underlying statutory scheme that limits the carrier in each mode to transportation within and by that mode, absent special exception.

■■■ These elementary observations make plain the legislative plan that motor carriers shall perform their authorized services by motor vehicle unless shipment by other modes is permitted by some specific statutory exception. The only relevant statute which allows such substitution is Section 216(c) of the Act.[15] It provides:

> "(c) Common carriers of property by motor vehicle may establish reasonable through routes and joint rates, charges, and classifications with other such carriers or with common carriers by railroad and/or express and/or water * * *. In case of such joint rates, fares, or charges it shall be the duty of the carriers parties thereto to establish just and reasonable regulations and practices in connection therewith, and just, reasonable, and equitable divisions thereof as between the carriers participating therein which shall not unduly prefer or prejudice any of such participating carriers. * * * *"

It is agreed on all sides that this provision is permissive. In declaring that carriers "*may* establish" through routes and joint rates, Congress left the matter to voluntary agreement, and did not empower the Commission to require such cooperation or coordination. This literal interpretation of Section 216(c) is reinforced by comparison with other provisions of the Act which, as between other classes of carriers, authorize compulsory through routes by Commission order.[16]

In the proceedings before the Commission and in this court, these plaintiffs submitted that to require the railroads to offer TOFC service equally to motor carriers would constitute the compulsory establishment of through routes in violation of the section. The Commission did not dispute the two premises of the argument: first, that the Commission is "without statutory power indirectly to require the establishment of through motor or motor-rail routes," [17] and second, that requiring railroads to offer open-tariff TOFC service to motor carriers would amount to establishing compulsory *de facto* through routes. The Commission avoided the argument, however, by concluding that no compulsion was involved in its Rules. The Report states:

> "However, to say that we would be requiring the establishment of through routes merely by finding that it is lawful for a motor carrier to use the open-tariff TOFC rate of a rail carrier overlooks the fact that such a finding would involve no compulsion whatever—either on rail carriers to hold out a TOFC service or, if they do, on motor carriers to use it. We find this argument to be without merit." [18]

13. Secs. 203(a) (1) and (c), 206(a) (1), 209(a) (1); 49 U.S.C. §§ 303(a) (1) and (c), 306(a) (1), 309(a) (1).

14. Sec. 418; 49 U.S.C. § 1018.

15. 49 U.S.C. § 316(c) (1935).

16. See Secs. 15(3), 1(4), Interstate Commerce Act, 49 U.S.C. §§ 15(3), 1(4);

United States v. Pennsylvania R. Co., 323 U.S. 612, 65 S.Ct. 471, 89 L.Ed. 499 (1945).

17. 322 I.C.C. 301, at 334.

18. 322 I.C.C. 301, 335.

The Commission's position is at odds with reality. To say that the railroads are subject to no compulsion so long as they can avoid such through routes by abandoning all TOFC service for anyone hardly preserves the free choice intended by the congressional direction that such carriers "may establish" through routes. If the absence of compulsion is measured by the availability of alternatives, here compulsion is absolute. Under Section 1(4) of the Act, the railroad is bound "to provide and furnish transportation upon reasonable request therefor * *."[19]

With equipment available for TOFC service, the railroad is thus compelled by law to provide such service to the general shipping public, and would then be compelled, under the Commission's Rule, to provide equal service to motor carriers, with no alternative at all.

With the Commission's ground untenable, counsel for the government and the Commission have resorted in this court to new grounds for avoiding the application of Section 216(c) and its implicit prohibition of compulsory through routes. This new position asserts that a through route exists by definition only when two carriers join in holding out the joint service. Since under the Commission's Rule the railroad would not join in holding out such service—and indeed would participate only by compulsion— it is said that no through route is involved. By verbal legerdemain, the rule against compulsory through routes thus

would be read out of existence, since the logic of the argument carries the conclusion that whenever there is compulsion there is no through route.

The want of reason in the position is exemplified by the Commission's holding that TOFC service as now provided under Plan I is authorized as a through route arrangement under Section 216(c). The operative features of that Plan are identical with the TOFC service contemplated by the Commission's newly promulgated Rule 3. In each case the motor carrier has the option, subject to the shipper's veto, to employ substituted rail service or to haul the trailers over the highway. The shipper pays the motor carrier's rates upon motor carrier bills, and the motor carrier is subject to limits on circuity and points of service. The only difference between the two schemes is the railroad's consent under existing Plan I. If that Plan is to be sustained as a voluntary through route under Section 216(c),[20] then the Commission's new open-tariff TOFC service must be viewed as involving a compulsory through route forbidden by the section.[21]

Moreover, the argument does not avoid the fundamental limit derived from the statutory scheme, prohibiting the carrier from performing its transportation services through a mode not within its authorization, absent special exception. Since the through route permitted by Section 216(c) is the exclusive statutory authority for the use of rail transporta-

19. 49 U.S.C. § 1(4) (1887).

20. None of the parties has challenged the validity of Plan I in the proceedings before this court. The legality of the Plan is under attack, however, in a separate suit pending in the District Court for the Northern District of Texas, Civil Action No. 4–355.

21. Carriers by water, otherwise governed by the same principles as motor carriers, must be differentiated on the matter of through routes. By virtue of Section 15 (3) of the Act, 49 U.S.C. § 15(3), "[t]he Commission *may*, and it shall whenever deemed by it to be necessary or desirable in the public interest, *after full hearing* upon complaint or upon its own initiative without complaint, *establish through*

*routes* * * * applicable to the transportation of passengers or property *by carriers by railroad* subject to this chapter and *common carriers by water* subject to chapter 12 of this title * * *." The Commission's Report and Order make no reference to this section as authority for the Rules promulgated, and its proceedings did not in any sense constitute the "full hearing" on the necessity for through rail-water routes which is required by that section. Since the section is the exclusive method by which the Commission may require joint rail-water service, and since its powers were not exercised or its requirements met, the Rules are no more valid as applied to TOFC services due water carriers than to motor carriers.

tion by motor carriers, the Commission's Rule must qualify, if it is valid at all, as establishing through routes under that section.

### V

Still another obstacle to the Commission's Rules is posed by the separate complaint of the freight forwarders. They assert that the Commission's new Rules are invalid in so far as they would permit motor carriers to "utilize TOFC service in the performance of all or any portion of their authorized service * * *."[22] The motor carrier would thereby be permitted to confine its own service to the assembly and consolidation of the shipment, leaving the actual transportation to the railroad, and would be acting not as a carrier but as a freight forwarder. The Rules thus run counter to the provisions of part IV of the Act which forbid any person to act as a freight forwarder without a permit issued by the Commission, and which prohibit the issuance of such permit to a common carrier.[23] In response, the Commission appears to have concluded that so long as the motor carrier holds the requisite authority, so that it *could* act as a carrier by transporting the shipment itself, it is acting in its capacity "as a carrier" even though no carrier service is performed in fact.[24] The non-carrying carrier thus would not be subject to the statute prohibiting any person from performing the services of a freight forwarder without a license, but would be excused by the provision exempting a person who performs such services "as a carrier."[25]

No reason is suggested why we should suppose that Congress meant to allow a motor carrier to perform only the services of a freight forwarder, not as an incident to furnishing transportation, merely because the carrier holds a bare unexercised authority to furnish transportation, while at the same time Congress prohibited the licensing of motor carriers as freight forwarders.

The principal foundation for the Commission's new Rules is apparently summed up in its observation "We can see no justification either from the standpoint of legislative limitations or of policy considerations, for holding that one carrier may in no circumstances make use of the services which another carrier holds out to the public generally."[26] The observation can be sustained only if the motor carrier is permitted, chameleon-like, to change its coloration to evade these statutory prohibitions. Thus, to escape the Congressional denial of power to establish compulsory through routes under Sec. 216(c), it is claimed that the motor carrier in using the railroad's open-tariff TOFC service is acting not as a connecting carrier, but merely as a private person belonging to the general shipping public. At the same time, to escape the freight forwarder's claim, it is said that the motor carrier does the same thing not as an ordinary member of the general shipping public but as a carrier. To keep faith with Congress, to give reasonable effect to its commands, we are obliged to eschew word-play and to read the statutes in the light and spirit of their purpose. The policy explicit in Sections 216(c) and 402(a) (5), and implicit in the structure of the Interstate Commerce Act as a whole, does not allow a motor carrier to perform its authorized service simply by tendering the shipment to the railroad for transportation without the railroad's concurrence. This policy is reflected in the National Transportation Policy declared by Congress "to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent ad-

---

22. Rule 500.3(a), 322 I.C.C. 413.

23. Sections 410(a) (1), (c), 49 U.S.C. 1010 (a) (1), 1010(c).

24. 322 I.C.C. 333, 335.

25. Section 402(a) (5), 49 U.S.C. § 1002(a) (5).

26. 322 I.C.C., at 335.

vantages of each \* \* \*." [27] This underlying purpose militates against allowing rail carriers to invade the motor carrier field,[28] and its reason extends equally to the converse situation, where motor carriers seek to exploit the inherent advantages of rail transportation.

## VI

■ We have thus far approached the issues of statutory interpretation as a matter of first impression. Our conclusion that the Commission's Rules exceed its powers under the Interstate Commerce Act does not rest alone, however, upon our construction of that legislation. The holding is supported and confirmed by the consistent and repeated decisions of the Commission and the courts. Few of these opinions can be regarded as directly holding that motor carriers cannot legally avail themselves of the railroads' open-tariff TOFC service without railroad concurrence. Nonetheless, they proceed upon premises which re-affirm the statutory principles previously considered.

The Commission's course of decision began before the enactment of part II of the Act, and before motor carriers were subjected to federal regulation. In Trucks on Flatcars Between Chicago and Twin Cities, 216 I.C.C. 435 (1936), the railroad had offered open-tariff service to motor carriers before the passage of part II; in a decision handed down after the regulatory act had taken effect, the Commission sanctioned the offering. It should be noted, however, that the railroad had voluntarily offered the service to attract the traffic of a motor carrier, and that some five months later the railroad withdrew its open-tariff offering and entered into a through-route, joint rate arrangement with the motor carrier, approved in Motor-Rail-Motor Traffic in East and Midwest, 219 I.C.C. 245.

Whatever implications of approval might be drawn from the earlier decision were overruled three years later in Substituted Freight Service, 232 I.C.C. 683 (1939). Here the Commission plainly held that a motor carrier could not lawfully substitute rail service for its authorized highway service for a part of the line haul. Although the decision emphasizes the necessity for publication of tariffs disclosing the manner of carriage, it also requires that such tariffs be published with the concurrence of the railroad. In the absence of such concurrence, which would establish a through route at joint rates under Sec. 216(c),[29] the opinion declares that it is "repugnant to the act" for a motor carrier "to act as a common carrier by motor vehicle and as a shipper by rail as to the same service \* \* \*." [30] This interpretation of the Act was followed and affirmed in an unbroken line of decisions of the Commission in the intervening years. Such cases as Ringsby Truck Lines, Inc. v. Atchison, Topeka & Santa Fe Ry. Co., 263 I.C.C. 139, 141 (1945); Savage Application, 265 I.C.C. 157, 167 (1947); and Movement of Highway Trailers by Rail (the so-called New Haven case), 293 I.C.C. 93 (1954), are illustrative. For twenty-five years, until the decision here under review, the Commission had adhered to this interpretation of the act directly in conflict with its newly announced views.

In the courts, a similar principle is established in holdings to the effect that a person who engages in transporting goods for the general public by using open-tariff service of common carriers is not himself engaged as a common carrier by motor vehicle, so as to be entitled to a certificate of public convenience and necessity under the "grandfather" provisions of the Act. Acme Fast Freight, Inc. v. United States, 30 F.Supp. 968

27. Act Sept. 18, 1940, 54 Stat. 899, 49 U.S.C. preceding § 1.

28. American Trucking Associations, Inc. v. United States, 364 U.S. 1, 6, 80 S.Ct. 1570, 4 L.Ed.2d 1527 (1959); United

States v. Rock Island Motor Transit Co., 340 U.S. 419, 431–432, 71 S.Ct. 382, 95 L.Ed. 391 (1951).

29. 49 U.S.C. § 316(c).

30. 232 I.C.C., 690.

(D.C.N.Y.1940), aff'd p. c. 309 U.S. 638, 60 S.Ct. 810, 84 L.Ed. 993; Ready Truck Lines, Inc. v. United States, 42 F.Supp. 970 (N.D.Ill.1941), affirmed 314 U.S. 580, 62 S.Ct. 176, 86 L.Ed. 470. The relevant premise of the decisions is that the authorized service of the common carrier by motor vehicle under the law is transportation over the public highways by motor vehicle, not rail transportation by railroad. The cases would be distinguishable only if we were willing to rule that the unexercised power to provide highway service qualifies a person as a motor carrier even though he provides transportation solely by rail instead.

In the Acme case, it was also urged that a joint service arrangement might be valid outside the limits of Section 216(c) of the Act, 49 U.S.C. § 316 (c), a contention similar to that presented by counsel for the government here. The court concluded as we have, that the provisions of that section are the exclusive means for establishing joint motor-rail through routes and joint rates, and that any such arrangement not in conformity with the section must fall.[31] Implicit in that section is the Commission's lack of power to compel motor carriers and rail carriers to provide coordinated service, and it was this lack of power which justified permitting railroads to provide motor carrier service incidental and supplemental to their rail transportation. Interstate Commerce Commission v. Parker, 326 U.S. 60, 72, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945). See Fulda, Rail-Motor Competition: Motor Carrier Operations by Railroads, 54 Nw.L.Rev. 156, 201 (1959).

Although it is settled that a common carrier may not discriminate against (or in favor of) another carrier shipping its own property for its own purposes,[32] Sections 2 and 3 of the Act have never, so far as appears, been interpreted by the Commission or the courts to require one carrier to perform service as a substitute for another carrie, *qua* carrier, as the Commission's new rules would command. In the face of this settled interpretation of the Act by the Commission itself as well as the courts, the deference ordinarily due to the construction of the Act by the administrative agency responsible for its enforcement is not called for. See All States Freight, Inc. v. New York, New Haven & Hartford Railroad, 379 U.S. 343, 85 S.Ct. 419, 13 L.Ed.2d 324 (1964); Atchison, Topeka and Santa Fe Railway Co. v. United States, 209 F.Supp. 35, 41–42 (N.D.Ill. 1962); United States v. Leslie Salt Co., 350 U.S. 383, 396, 76 S.Ct. 416, 100 L.Ed. 441 (1956).

Moreover, this settled interpretation of the Act has been recognized and accepted by both the executive and legislative branches. In his Message to Congress Relative to the Transportation System on April 5, 1962, the President recommended legislative action to achieve precisely the result of the Commission's Rules here in issue.[33] Bills to effectuate this proposal were introduced both in the Senate and in the House in 1962 and again in 1963.[34] Pending at the same time were bills proposed by the Commission itself to achieve a similar objective by amending Section 216(c) of the Act to empower the Commission to compel motor car-

---

31. 30 F.Supp. at 973.

32. I.C.C. v. Baltimore & Ohio R.R., 225 U.S. 326, 32 S.Ct. 742, 56 L.Ed. 1107 (1912). Freight forwarders, not entitled to establish through routes and joint rates with common carriers under the Act, are in the same position as ordinary shippers and are thus protected from discrimination under the Act. I.C.C. v. Delaware, L. & W. R.R., 220 U.S. 235, 31 S.Ct. 392, 55 L.Ed. 448 (1911).

33. H.R.Doc. No. 384, 87th Cong., 2d Sess.

34. S. 3242 and H.R. 11584, 87th Cong., 2d Sess. (1962) and S. 1062 and H.R. 4701, 88th Cong., 1st Sess. (1963). It should be noted that each bill would have amended Section 2 of the Act not to prohibit discrimination against competing carriers generally and as to all service, as the Commission's reading would require, but merely to prohibit discrimination in the transportation of "loaded or empty vehicles or shipping containers," that is, TOFC service.

riers and railroads to establish through routes.[35] Congress failed to enact any of these proposals. While courts must take care not to give undue weight to legislative inaction, the fact that the President placed before the Congress a proposal predicated upon a specific interpretation of existing law cannot wholly be ignored in interpreting that law when Congress has refused to make the suggested change. See Blau v. Lehman, 368 U.S. 403, 412–413, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962); Maurer v. Hamilton, 309 U.S. 598, 613, 60 S.Ct. 726, 84 L.Ed. 969 (1940).

■ In conclusion, it appears that neither the specific provisions of the Interstate Commerce Act nor its general underlying scheme confer authority upon the Commission to compel railroads to provide open-tariff TOFC service to motor carriers; on the contrary, the Act both in its specifics and general policy, forbid such compulsion. With the confirmation of this interpretation in an unbroken line of Commission decisions, in judicial precedent, and in executive and legislative understanding, there is no room for the Commission to alter the settled meaning. Like the Commission, this court is foreclosed from indulgence in the broad formulation of wise transportation policy. Those considerations belong to the Congress. We therefore hold that Rules 2 and 3 as promulgated by the Commission in this proceeding, and Rule 5 in so far as it amplifies those rules, are invalid and must be set aside.

### VII

Two collateral matters remain for disposition. While the plaintiffs asserted principally the invalidity of Rules 2 and 3, they have also attacked Rules 5 and 7 promulgated by the Commission in the same proceeding and order.

■ Rule 5 represents the Commission's effort to assure that TOFC service will not be misused by motor carriers as a means of circumventing the limits of their certificates concerning authorized routes. Since a motor carrier might be able to link its separately authorized routes to create a circuitous route between authorized points of service, and to achieve the benefits of a direct route authorization by utilizing TOFC service directly between those points, Rule 5 permits motor carriers to use TOFC service "in lieu of their authorized line haul transportation" only if the rail distance is at least 85 per cent of the highway distance by the authorized route.[36] In so far as this Rule relates to open-tariff TOFC service, it falls, *pro tanto*, with Rules 2 and 3. The railroads have attacked its remaining application to joint intermodal service as ambiguous and arbitrary, to the extent that it may control joint intermodal service under existing plan V. We cannot agree that the Rule is without rational foundation. To the extent that through routes are established end to end under plan V, the Rule by its terms has no application. Where the TOFC service is used "in lieu of" the motor carrier's line haul transportation between points the motor carrier could serve, we cannot conclude that the Commission was fatally arbitrary in concluding that respect for the limits of the certificates issued requires the imposition of circuity safeguards, whether the in-

---

35. S. 3510 and H.R. 12362, 87th Cong., 2d Sess. (1962); S. 676 and H.R. 2088, 88th Cong., 1st Sess. (1963).

36. The Rule provides in relevant part:

500.5 *Circuity limitations.*—

(a) Motor and water common carriers shall not participate in joint intermodal TOFC service which is to be provided in lieu of their authorized line-haul transportation, and motor and water common and contract carriers shall not utilize open-tariff TOFC service, where the distance from origin to destination over the route including the TOFC movement is less than 85 per cent of the distance between such points over the motor or water carrier's authorized service route; *provided, however*, that the Interstate Commerce Commission may grant relief from the provisions of this paragraph upon consideration of an appropriate petition.

termodal arrangement for the substitution of TOFC service would be classed as plan I or plan V.

■ Finally, the plaintiffs have attacked the validity of Rule 7, claiming it to be arbitrary, ambiguous, and beyond the Commission's power. In substance, the Rule requires publication in tariff form of the rates and rules governing the leasing of equipment (practically, highway trailers) by a railroad or its affiliate to any person using the railroad's TOFC service. Literally, the Rule does not require that the lease be *for the purpose* of TOFC shipment, but only to a "person using" the railroad's TOFC service. It is plain from the objectives of the Commission as elaborated in its Report, however, that the Commission was concerned with the leasing of trailers by the railroad for use in its own TOFC service, as part of the total transportation service supplied. This limited interpretation of the Rule was specifically avowed by counsel for the government on brief and in oral argument. In this reading, the Rule would find support in Section 6(1) of the Act, requiring full publication of all charges and privileges or facilities affecting the value of the service rendered to the shipper, and by Section 1(3) (a), defining rail "transportation" to include the instrumentalities of carriage, irrespective of ownership.

Since the proceeding must be remanded to the Commission in any event, for a general revision of the Rules as a whole in conformity with these views, we will adopt and accept this limited interpretation of Rule 7. The Commission will have an early opportunity to clarify its intent if a broader scope should be thought necessary. Limited in this way, the Rule appears to be subject to no invalidating objection.

A decree will be entered for the plaintiffs, consistent with the foregoing conclusions.