# PUBLIC UTILITIES COMMISSION

### v.

# BANGOR & AROOSTOOK RAILROAD CO.
### and Fox & Ginn, Inc.

Supreme Judicial Court of Maine.

April 5, 1967.

---

John G. Feehan, Augusta, for Public Utilities Commission.

Scott W. Scully, Portland, for Maine Cent. R. R., for intervenors.

Raymond E. Jensen, Portland, for Cole's Express.

Richard B. Sanborn, Augusta, and William M. Houston, Bangor, for Bangor & A. R. R.

Frank M. Libby, Winthrop, for Fox & Ginn, Inc.

Frank E. Southard, Augusta, for Maine Motor Rate Bureau.

Before WILLIAMSON, C. J., and WEBBER, TAPLEY, MARDEN and DUFRESNE, JJ.

WEBBER, Justice.

This was an appeal from an order of the Public Utilities Commission in effect declaring that certain joint rates and charges filed by the Bangor & Aroostook Railroad Company (BAR) and Fox & Ginn, Inc. (Fox) are not per se unlawful. The rates are applicable between certain points in Maine to be serviced jointly with respect to carriage of freight by BAR and Fox. Maine Central Railroad Company and Cole's Express as intervenors are appellants here. The issue is not the reasonableness of rates, a matter left for later determination upon a new petition. The issue is rather the extent of the operating authority of the carriers and their lawful right to provide a single joint service for which a single joint tariff is filed. BAR carries freight principally by rail—Fox by truck.

Is there statutory authority for such rail-truck joint service and joint rates? We turn at once to the pertinent sections of 35 M.R.S.A. A railroad is by statutory definition a "public utility". The motor vehicle carrier is not. Secs. 15(3) and 15(13). The rates, including joint rates, filed by public utilities must be just and reasonable. Sec. 51. "Where a schedule *of joint rates* or charges is or may be in force *between 2 or more public utilities,* such schedules shall in like manner be printed and filed with the commission and so much thereof as the commission shall deem for the use of the public shall be filed in every such station or office as provided in sections 62." Sec. 63. (Emphasis ours) "The commission may, after hearing, on a complaint or upon its own motion without complaint, require *any 2 or more railroads* operated by steam whose lines form a continuous line of transportation, or could be made reasonably to do so by the construction and maintenance of switch connection or interchange track at connecting points, to establish through routes *and joint rates,* fares, charges and classifications for the transportation of property or passengers, provided there is no reasonable existing through route between the places it is desired to serve." Sec. 67 (Emphasis ours) If such railroads fail to establish *such joint rates,* the Commission may prescribe them. Sec. 68. Operators of motor vehicles transporting freight must obtain from the Commission a certificate declaring that public convenience and necessity require and permit such operation. Sec. 1552. Holders of such certificates are under general supervision and regulation of the Commission. Sec. 1553. Holders of such certificates may file rates *"established jointly with other such holders * * over routes not served by a single common carrier."* Sec. 1554. (Emphasis ours) A railroad desiring to supplement its service by operating motor vehicles over the highways must obtain from the Commission a

certificate of public convenience and necessity. Sec. 1557.

■ We cannot escape the conclusion that the Legislature has seen fit to provide specifically for those situations in which joint rates may be filed. It has clearly and expressly provided for the filing of such schedules by two or more railroads. It has in like manner provided for the filing of such schedules by motor vehicle carriers but has seen fit to attach a condition not applicable in the case of railroads. The Legislature has not seen fit merely to entrust to the Commission the power to determine when and under what conditions various types of carriers may file joint rates for a joint service. In our view, when the Legislature has entered the field with the degree of specificity evidenced here, its enactments must be deemed to be exclusive and the absence of any provision for rail-truck joint rates must be considered significant and controlling.

There are persuasive reasons for leaving the matter to legislative determination. There are basic underlying policy decisions to be made. Will a new form of rail-truck service affect the potential economic strength of either railroads or motor vehicle carriers and their importance to the economy of the State? Will such a new service affect highway maintenance and traffic congestion? Will such new service substantially benefit the public and facilitate the movement of freight within the state and to and from out of state markets? The Legislature might decide to provide expressly for rail-truck joint rates, or alternatively to forbid them utterly. If statutory permission were forthcoming, the Legislature might see fit to attach appropriate conditions as it did in Sec. 1554. There the motor vehicle freight carriers are expressly limited in the filing of joint schedules to "routes not served by a single common carrier." Or the Legislature might conclude that it would authorize joint rail-truck service and schedules only where there is an adequate showing that public convenience and necessity so require.

We find some support for our conclusion in cases which have been called to our attention. In Acme Fast Freight v. United States (1940), 30 F.Supp. 968, 973 (Aff'd per curiam 309 U.S. 638, 60 S.Ct. 810, 84 L.Ed. 993) certain forwarders sought to establish joint rates with motor vehicle carriers. The federal statute permitted common carriers by motor vehicle (including by definition express companies) to establish joint rates with other such companies. The court held that forwarders, not being either carriers or express companies, could not "share in joint rates with truck companies." Hand, J., said in part:

"But the forwarders contend that even if within the meaning of the Act they are neither common carriers by motor, nor express companies, they may nevertheless establish joint rates *because they are not prohibited from so doing* by Section 216 (c). That contention seems to us without merit. The section prescribes under what circumstances there may be joint rates *and we cannot suppose that its provisions are not exclusive.*" (Emphasis ours)

See also Atchison, T. & S. F. Ry. Co. v. United States (D.C.1965), 244 F.Supp. 955, 969.

We recognize that a contrary view was expressed in Southern Ry. Co. v. Louisville Cooperage Co. (1924), 205 Ky. 721, 266 S.W. 382. Here a third party was endeavoring to recover an allegedly excessive charge. The court reasoned that if the Commission could regulate the rates of each carrier separately, it could regulate their joint rates. There is no suggestion, however, that the Kentucky legislature had previously spelled out specific provisions for joint rates in the manner and to the extent that is found in our Maine statutes. Moreover the court may well have been influenced in part by its knowledge that a subsequent statute conferred authority with respect to the (rail-water) joint rates in issue. The court said this later statute was merely declaratory of what the law had always been.

In San Juan Coal & Coke Co. v. Santa Fe, S. J. & N. Ry. Co. (1931), 35 N.M. 512, 2 P.2d 305, 307 the power to regulate rates of carriers was vested in the State Corporation Commission *by the constitution* and included the authority to regulate "all charges and rates." The court construed this power as broad enough to include the control of joint rates. The court said, however: "If the commission were a creature of the Legislature, we should construe its powers with some strictness. Such powers as the Legislature had not conferred or delegated, it would be deemed to have reserved." See also in this connection Auburn Water District v. PUC et al. (1960), 156 Me. 222, 225, 163 A.2d 743, 744.

We have examined other cases cited by the appellees and find them to be distinguishable upon their facts, either because statutes when properly construed authorized the joint rates in question or for other reasons.

■ We note with interest that in 1956 the Commission, acting pursuant to the authority now set forth in 35 M.R.S.A. Sec. 1557, issued to BAR a certificate of public convenience and necessity with restrictions. BAR was thereby permitted to carry freight by truck between certain "base points" located on its rail lines and certain designated "service points". There was no authorization for motor carrier transportation between "base points" and the authority was thus limited to prevent the joining together of an operation that would put BAR in the trucking as well as the railroad business. The second restriction limited the freight that could be moved by truck between "base points" and "service points" to less carload shipments which were defined as shipments which weigh 10,000 pounds or less. The third restriction, designed to keep the trucking activity of BAR in its proper sphere, required that shipments might move by truck between a "base point" and a "service point" if and only if such shipments had

"an entire prior or entire subsequent movement by railroad." The apparent purpose of this latter restriction was to prevent a truck-rail-truck movement which might otherwise have the effect of introducing a new competitor into the field of motor transportation without proof of public convenience and necessity. The effect of the Commission's decree in the instant case appears to be to vitiate its own restriction with respect to a truck-rail-truck movement. There was placed upon the record by stipulation in this case an illustrative example which was used by the Commission in its decision, as follows: "For the purpose of this case only, it is further stipulated and agreed that traffic is picked up at Portland by Fox & Ginn, Inc., thence transported by highway to Northern Maine Junction, transferred to rail and moved by rail to Caribou, Maine, thence by truck under Bangor and Aroostook Railroad Company's authority above stipulated to Madawaska, Maine." Caribou is a BAR "base point" and Madawaska is a "service point." Since a joint service performed under a joint tariff schedule must be viewed as a single carriage from origin to destination, it is evident that the illustrative transportation under a joint rate schedule would violate the Commission's own restriction requiring "an *entire prior * * * movement* by railroad." (Emphasis ours) The primary importance of this consideration, as we view it, is that it serves to illustrate graphically the type of policy question which might well be of concern to the Legislature in determining whether or under what circumstances it would authorize rail-truck joint rates. We are satisfied in any event that requisite statutory authority for rail-truck joint rates does not as yet exist and must await legislative determination.

Appeal sustained. Remanded to the Public Utilities Commission for further proceedings not inconsistent with this opinion.

RUDMAN, J., did not sit.