**The NEW YORK CENTRAL RAILROAD COMPANY et al., Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**No. 66 Civ. 1484.**

United States District Court
S. D. New York.
April 28, 1967.

John A. Daily, New York City, for plaintiffs.

Robert M. Morgenthau, U. S. Atty., and Michael Hess, Asst. U. S. Atty., New York City, for defendant United States of America.

I. K. Hay, Deputy General Counsel, Interstate Commerce Commission, Washington, D. C., for defendant Interstate Commerce Commission.

Sidney Goldstein, New York City and James M. Henderson, Washington, D. C., for Port of New York Authority, intervening defendant.

Wilmer A. Hill, Washington, D. C., Ames, Hill & Ames, Washington, D. C., and Thomas D. Shea, New York City, for intervening defendants Acme Fast Freight et al.

Richard R. Sigmon, Washington, D. C., Rice, Carpenter & Carraway, Washington, D. C., and Thomas D. Shea, New York City, for intervening defendants Eastern Central Motor Carriers Ass'n, Inc. and The Waterways Freight Bureau.

Before FRIENDLY, Circuit Judge, and TENNEY and LEVET, District Judges.

LEVET, District Judge.

This action was brought by the plaintiffs under §§ 1336, 1398, 2284 and 2321 through 2325 of Title 28, U.S.C. to set aside and enjoin the order of the Interstate Commerce Commission, No. 34254, April 1, 1966, cited as Application of Section 4 Requirements to Joint Motor-Rail Rates Established Under Section 216(c), 326 ICC 453. The Commission's decision also embraces I & S Docket No. 7956, Petroleum, TOFC, Sewaren, N. J., to Zionsville, Ind.

The plaintiffs, The New York Central Railroad Company, The Pennsylvania Railroad Company, The Baltimore and Ohio Railroad Company, and Class I Southern Territory Railroads, are railroad corporations engaged as common carriers in the transportation of property and passengers by railroad in interstate commerce. Plaintiff, Spector Freight System, Inc., is a certificated common carrier engaged in the transportation of property by highway in interstate commerce. Plaintiff, The New York Central Railway Company, is a Delaware corporation with principal offices in New York County, New York, N. Y., and therefore venue properly lies in this court. Plaintiffs, Baltimore and Ohio Railroad Company and Class I Southern Territory Railroads, intervened in ICC No. 34254 and were parties to the proceeding before the Commission. The Louisville and Nashville Railroad Company and the Chesapeake and Ohio Railroad Company filed briefs before the Commission in support of plaintiffs' position. The Port of New York Authority, Eastern Central Motor Carriers Association, Waterways Freight Bureau, Acme Fast Freight, Inc., National Carloading Corporation, Pacific and Atlantic Shippers, Springmeier Shipping Co. and Universal Carloading & Distributing Company, Inc., intervening defendants, filed briefs in opposition both before the Commission and in the instant proceeding. Except for the Port of New York Authority, the intervening defendants are motor carriers or freight forwarders engaged in the transportation of freight in interstate commerce. It is interesting to note that not a single private shipper appears in opposition.

Pursuant to §§ 2321 through 2325 of Title 28, U.S.C., this review was heard before this three-judge court.

The controversy involves joint rail-motor rates maintained, or to be maintained, by plaintiffs and certain motor carriers—more particularly joint rates for trailer-on-flat car ("TOFC" or "piggyback") service. Two categories of TOFC service, out of the five which have evolved from the carriers' practices and the Commission's rulings, are involved herein, i. e., Plans II and V as described in Substituted Service-Charges & Practices of For-Hire Carriers & Freight Forwarders, 322 ICC 301, 304–05 (1964) (hereinafter "Substituted Service"). Under Plan II TOFC, the entire door-to-door service is provided by the railroad under a single bill of lading, moving its own trailers or containers on flatcars, under tariffs usually similar to those of truckers. It is generally limited to local pick-up and delivery and is regulated under Part I of the Interstate Commerce Act (Sections 1–27 inclusive of Title 49, U.S.C.). Plan V TOFC, however, involves through motor-rail or motor-rail-motor services, with independent line-haul motor carriers at one or both rail terminals and joint rates applicable only over the through route or routes, the motor carriers being subject to Part II of the Interstate Commerce Act, Sections 301–327, inclusive, Title 49, U.S.C. Either the railroad or the motor carrier may originate or deliver a Plan V shipment, which may move on either a rail or motor bill of lading depending on which carrier originates the shipment.

The railroad provides only ramp-to-ramp service, or either the pick-up or delivery but not both.[1]

The New York Central case (ICC No. 34254) arose from a Petition For A Declaratory Order filed by plaintiff New York Central with the Commission pursuant to Section 5(d) of the Administrative Procedure Act (Section 1004(d) of Title 5, U.S.C.). The railroad has established a Plan II TOFC rate on air coolers from Louisville, Kentucky, to New York City, of $1.52 per 100 pounds. It has a Plan V rate of $1.48 per 100 pounds from Louisville to Trenton, New Jersey, by way of New York City, the New York City-to-Trenton run being handled by motor carrier. The Pennsylvania Railroad has a direct route from Louisville to Trenton and offers a Plan II rate of $1.48 per 100 pounds for that route. Obviously, New York Central's Plan II TOFC rate is greater for the shorter route from Louisville to New York City than its Plan V TOFC rate for the longer route from Louisville to Trenton via New York City. On January 17, 1963, the Secretary of the Commission advised the New York Central that the joint rail-motor TOFC rates from Louisville to Trenton (Plan V), which were lower than the all-rail TOFC rates from Louisville to New York (Plan II), constituted a violation of the long- and short-haul clause of Section 4(1) of Part I of the Interstate Commerce Act (Section 4(1) of Title 49 U.S.C.).[2] The railroad thereafter filed

1. The numbering of the various plans is a matter of common usage in the railroad industry. There are five altogether, described by the ICC in Substituted Service-Charges & Practices of For-Hire Carriers & Freight Forwarders, 322 ICC 301, 304–05 (1964) (hereinafter cited as "Substituted Service"). Of the other three, Plan I is a joint motor-rail tariff, the railroad moving trailers or containers of the motor carrier between points on the motor carrier's route. In effect, the motor carrier substitutes rail carriage for part of its own line haul and this plan can be used only where the motor carrier is licensed under Part II of the Act to serve the points of pick up and delivery. There seems to be no reason in principle why it should be treat-

ed differently from Plan V for purposes of Section 4(1). The two remaining plans are all-rail "open" tariffs as opposed to joint tariffs. Under Plan III the railroad provides ramp-to-ramp transportation for trucks provided by the shippers or freight forwarders. Under Plan IV the railroad hauls container-loaded flatcars owned or leased by the shipper or forwarder. As with Plan II, these two would be subject entirely to Part I of the Act.

2. Section 4(1) of the Interstate Commerce Act, 49 U.S.C. § 4(1) reads:
    "*It shall be unlawful for any common carrier subject to this part or part III to charge or receive any greater compensation in the aggregate*

its petition for a declaratory order (a) that Section 4 does not apply to the joint rates filed jointly by the railroad and the motor carriers, and (b) that, even if Section 4 does apply, it has not been violated because the services rendered by the railroad under the two sets of tariffs (Plans II and V) differ. By a six-to-five vote, the Commission rejected the recommended report and order of its hearing examiner supporting the railroads, and decided against the railroads on both issues. On its own motion, the Commission also raised and answered a third point, holding that competition with the Pennsylvania Railroad's Plan II service between Louisville and Trenton did not entitle the New York Central to automatic relief under the second ("circuity") proviso of Section 4(1) for its Plan V service.[3]

The second ICC order (I & S Docket No. 7956) resulted from a proceeding against the Pennsylvania Railroad and the Spector Freight System, Inc., charging that certain joint tariffs they filed violated Section 4(1) of the Act. The Pennsylvania Railroad published reduced joint motor-rail-motor TOFC rates in connection with plaintiff Spector Freight System, Inc., a certificated motor carrier, the rates to apply on petroleum and petroleum products from Sewaren, New

for the transportation of passengers, or of like kind of property, for a shorter than for a longer distance over the same line or route in the same direction, the shorter being included within the longer distance, or to charge any greater compensation as a through rate than the aggregate of the intermediate rates subject to the provisions of this part or part III, but this shall not be construed as authorizing any common carrier within the terms of this part or part III to charge or receive as great compensation for a shorter as for a longer distance: *Provided*, That upon application to the Commission and after investigation, such carrier, in special cases, may be authorized by the Commission to charge less for longer than for shorter distances for the transportation of passengers or property, and the Commission may from time to time prescribe the extent to which such designated carriers may be relieved from the operation of the foregoing provisions of this section, but in exercising the authority conferred upon it in this proviso, the Commission shall not permit the establishment of any charge to or from the more distant point that is not reasonably compensatory for the service performed; and no such authorization shall be granted on account of merely potential water competition not actually in existence: *Provided further*, That any such carrier or carriers operating over a circuitous line or route may, subject only to the standards of lawfulness set forth in other provisions of this part or part III and without further authorization, meet the charges of such carrier or carriers of the same type operating over a more direct line or route, to or from the competitive points, provided that rates so established over circuitous routes shall not be evidence on the issue of the compensatory character of rates involved in other proceedings: *And provided further*, That tariffs proposing rates subject to the provisions of this paragraph requiring Commission authorization may be filed when application is made to the Commission under the provisions hereof, and in the event such application is approved, the Commission shall permit such tariffs to become effective upon one day's notice."

3. Section 4 is set out in full in note (2), supra. The reasoning of the Commission is that a railroad operating alone under Plan II is not "the same type" of carrier, for purposes of the proviso, as a railroad and a motor carrier operating jointly under Plan V. The issue has been argued in this court. The plaintiffs contend that, if Plans II and V are held to be "transportation * * * of like kind of property" (i. e., providing the same kind of service) within the meaning of the main clause of Section 4(1), then they should also be deemed to be provided by "carriers of the same type" under the proviso. The defendants answer that the former phrase looks to the service provided to the shipper, the latter, to the relationship between the carriers. The defendants, however, do not explain why the relationship between the carriers is economically significant, and without such background it is difficult to determine the intent of Congress from the language of the statute. In view of the grounds upon which we decide this case, we do not find it necessary to reach the issue.

Jersey, to Zionsville, Indiana. The Pennsylvania also maintained a higher all-rail TOFC rate between Kearny, New Jersey, and Indianapolis, Indiana. Accordingly, the Commission suspended the proposed motor-rail-motor rate, since that rate would operate from Sewaren to Zionsville over the Pennsylvania Railroad between Kearny and Indianapolis and would appear to violate the long- and short-haul clauses of Section 4(1). The question of the application of the "circuity" proviso of that Section has not been raised in this latter case.

The Commission's hearing notice of September 16, 1963, set forth two issues to be determined:

"1. Whether motor-rail or motor-rail-motor rates are subject to the provisions of section 4 of the Interstate Commerce Act, and

"2. Whether the services performed in connection with plan II and plan V trailer-on-flatcar rates differ to such an extent that no violation of the fourth section results."

■ Since we conclude that motor-rail or motor-rail-motor rates are not subject to the provisions of Section 4, it is not necessary for us to reach any determination of the second issue posed.

The keystone to the Commission's majority report is its decision in Motor-Rail-Motor Traffic in East and Midwest, 219 ICC 245 (1936), handed down shortly after the passage of the Motor Carrier Act of 1935, and followed in a number of decisions from 1937 through 1955.[4] However, none of these decisions has been subject to judicial review.

The sum and substance of the Commission's decision in Motor-Rail-Motor Traffic, supra, is that:

"While Section 4 does not apply to the charges of motor common carriers, when such a carrier joins in a through route and joint rates with a railroad, it becomes a participant with the railroad in a movement *which is subject to that section.* Motor common carriers are not required to join with rail carriers in such routes and rates but, having voluntarily entered into such a joint arrangement, *the motor carrier assumes obligations* similar to those of the participating rail carrier in the observance of the provisions of section 4." (Emphasis added.) 219 ICC at 272.

The ruling sets forth no statutory authority for such a conclusion, nor is any such authority presently suggested.

Indeed, analysis of the statutory provisions involved in or relevant to the question, and the references validly to be drawn from judicial consideration of the Act, point to the contrary and support the determination which we here reach.

■ The first point raised by the defendants is that the administrative ruling, derived from Motor-Rail-Motor Traffic, supra, is so well established that it cannot now be overturned by the court. While it is true that "a construction made by the body charged with the enforcement of a statute, which construction has long obtained in practical execution, and has been impliedly sanctioned by the re-enactment of the statute without alteration in the particulars construed, when not plainly erroneous, must be treated as read into the statute", New York, N. H. & H. R. Co. v. Interstate Commerce Commission, 200 U.S. 361, 401–402, 26 S.Ct. 272, 281, 50 L.Ed. 515 (1906), where the Commission has adopted a construction antagonistic to the construction it had previously followed, the later construction is entitled to little weight as an administrative determination. Atchison,

4. Joint Motor-Rail Rates on Lumber from Savannah, Tenn., 220 ICC 275 (1937); Motor-Rail Rates of Chicago Great Western Railroad, 231 ICC 273 (1938); Texas & Pacific Motor-Rail Rates, 279 ICC 135 (1950); and Autos, Barge Proportional, Evansville to Guntersville, 297 ICC 251 (1955). In three of these four cases, as in Motor-Rail-Motor Traffic in East and Midwest, relief from Section 4 was granted. The one in which relief was contested and denied, Autos, Barge Proportional, Evansville to Guntersville, supra, involved barge-motor rates, not rail-motor rates. The Commission's jurisdiction under Section 4 was not contested in the Lumber from Savannah or in the Chicago Great Western cases.

Topeka and Santa Fe Railway Co. v. United States, 209 F.Supp. 35, 41–42 (N.D.Ill.E.D.1962), even though such later construction may not require corrective action by a reviewing court. Yale Transport Corp. v. United States, 210 F. Supp. 862, 864 (S.D.N.Y.1962), aff'd mem., 373 U.S. 540, 83 S.Ct. 1537, 10 L. Ed.2d 687 (1963); Eastern Central Motor Carriers Ass'n v. United States, 239 F.Supp. 591, 599 (D.D.C.1965). Administrative interpretations, regardless of the time they may have been in effect, do not become the ruling law on the issue if the initial interpretation was erroneous or beyond its authority in the first place. T. I. M. E., Inc. v. United States, 359 U.S. 464, 475–478, 79 S.Ct. 904, 3 L.Ed.2d 952 (1958); County of Marin v. United States, 356 U.S. 412, 420, 78 S.Ct. 880, 2 L.Ed.2d 879 (1958). The strength of the Commission's interpretation is further diluted by the close division of the Commission itself in this very case. Moreover, it is for Congress alone to determine the subject matter, circumstances, and methods of regulating interstate commerce, Parkersburg & Ohio River Transportation Co. v. City of Parkersburg, 107 U.S. 691, 701, 2 S.Ct. 732, 27 L.Ed. 584 (1882), and, "by virtue of its constitutionally-vested exclusive and plenary power over interstate commerce" can authorize action on the part of a carrier or carriers without prior approval by the Commission. State of New Jersey v. United States, 168 F.Supp. 324, 331–332 (D.N.J.1958), aff'd mem., 359 U.S. 27, 79 S.Ct. 603, 3 L.Ed.2d 625, rehearing denied, 359 U.S. 950, 79 S.Ct. 722, 3 L.Ed.2d 683 (1959).

■■ In our review of the Commission's authority, it is our duty to measure the administrative action solely against the statutory grounds invoked by the agency. "In the exercise of judicial review, a court is not at liberty to seek its own justification for the Commission's order or to accept appellate counsel's post hoc rationalizations." Atchison, Topeka and Santa Fe Railway Co. v. United States, 244 F.Supp. 955, 960–961 (N.D.Ill.1965), probable jurisdiction noted, American Trucking Ass'n, Inc. v. Atchison T. & S. F. Ry. Co., 384 U.S. 902, 86 S.Ct. 1337, 16 L.Ed.2d 356 (1966), citing Burlington Truck Lines v. United States, 371 U.S. 156, 168, 169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); and Atchison, Topeka and Santa Fe Railway Co. v. United States, 209 F.Supp. 35, 45 (N.D.Ill.1962). Accord, American Trucking Associations Inc. v. United States, 364 U.S. 1, 13–14, 80 S.Ct. 1570, 4 L.Ed.2d 1527 (1960).

■ The Commission, as a creation of Congress, has only the power bestowed upon it by its constituent legislation and, conversely, the railroads have only the duties imposed upon them by the same statute. The ultimate responsibility and power to determine the limits of the administrative power and the private duty lies in the courts. East Texas Motor Freight Lines v. Frozen Food Express, 351 U.S. 49, 54, 76 S.Ct. 574, 100 L.Ed. 917 (1956); Social Security Board v. Nierotko, 327 U.S. 358, 368–370, 66 S. Ct. 637, 90 L.Ed. 718 (1945); United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 489, 62 S.Ct. 722, 86 L.Ed. 971 (1942). Accordingly, the administrative construction is merely an aid to judicial interpretation and is not binding on the court. Burnet v. Chicago Portrait Co., 285 U.S. 1, 16, 52 S.Ct. 275, 76 L.Ed. 587 (1932). This is particularly true where, as here, we are not dealing with matters peculiarly within the expertise of the Commission, are not concerned with the desirability of uniform application of the law and the settlement of cases at the administrative level or with the protection of vested rights and public reliance on settled law. Nor is the provision in question a broad statement of policy which Congress has assigned to the Commission for detailed interpretation. Compare F. T. C. v. Ruberoid Co., 343 U.S. 470, 484–487, 72 S.Ct. 800, 96 L.Ed. 1081 (1952). The provisions of the National Transportation Policy are the statutory guide furnished by Congress to the Commission (49 U.S.C. preceding §§ 301, 901 and 1001), which declares that it is the policy

of Congress " * * * to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; * * *." What we are dealing with in Section 4(1) is a detailed, specific, prophylactic regulation, without technical language which would require expertise in the field for its interpretation. Atchison, Topeka and Santa Fe Railway Co. v. United States, 209 F.Supp., supra at 43.

Indeed, nobody claims any ambiguity in the act "to be clarified by resort to legislative history, either of the Act itself or of subsequent legislative proposals which failed to become law." Packard Motor Car Co. v. National Labor Relations Board, 330 U.S. 485, 492, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947); Atchison, Topeka and Santa Fe Railway v. United States, 209 F.Supp., supra at 43.

The provisions of the statute are clear. The provisions of Part I of the Interstate Commerce Act apply to "common carriers engaged in—(a) The [interstate] transportation of passengers or property wholly by railroad, or partly by railroad and partly by water * * *," 49 U.S.C. § 1(1) (a), and Section 4(1) applies to "any common carrier subject to this part or part III of this Act [i. e., railroads and interstate water carriers] * * *." 49 U.S.C. § 4(1). The provisions of part II apply "to the transportation of passengers or property by motor carriers engaged in interstate or foreign commerce * * *," 49 U.S.C. § 302(a), and the term, "interstate commerce" under Part II includes commerce which moves "partly by motor vehicle and partly by rail, express, or water * * *." 49 U.S.C. § 303(a) (10).

In construing the statute, the first point to be noted is that, under Section 1(1) (a), Part I would not apply to motor-rail transportation where the rail portion was wholly within one state although the motor portion crossed state lines. Part II would cover any motor-

rail transportation crossing state lines. While this omission in Part I may be of minimal practical effect, if Congress had intended to regulate any phase of motor-rail transportation under Part I it would hardly have made such an arbitrary exception intentionally. On the other hand, in view of the tight draftsmanship on the face of the statute and the number of revisions to which the statute as a whole has been subjected, the exception is probably not an oversight.

In addition, the authorization for the establishment of through routes and joint rates between motor carriers and railroads is found in Part II, 49 U.S.C. § 316(c), and Part II gives the Commission explicit power to regulate such routes and rates as well as the standards and procedures by which the power is to be exercised. 49 U.S.C. § 316(c), (f), (g). The provisions are almost identical in wording with those applicable to rail carriers under Part I, 49 U.S.C. §§ 1 (4), 15(6), (7), except that the establishment of through routes and joint rates is entirely voluntary under Part II and cannot be compelled by the Commission, as under Part I. Certainly the provisions of Part II dealing with combined motor-rail operations on their face form a complete, self-contained system of regulation which includes protection against the evil dealt with in Section 4(1). See Accelerated Transp.-Pony Express, Inc. v. United States, 227 F.Supp. 815 (D. Vt.), aff'd mem., 379 U.S. 4, 85 S.Ct. 43, 13 L.Ed.2d 21 (1964). The very language employed by the Congress in the enactment of Part II permits of no doubt that it intended to and did create a self-contained regulatory scheme covering all-motor, joint motor-rail and joint motor-water rates.

Finally, where Congress has intended to cover by Section 4(1) carriers subject to another part of the Interstate Commerce Act, it has done so explicitly, and where it has intended to subject motor carriers to the same rules as railroads, it has done that explicitly. That Congress did not intend to add Section 4 of

Part I to the regulatory provisions of Part II is emphasized by the manner in which it freely used the language of Part I to make up similar provisions for Part II on other phases of regulation.

The maxim, "Expressio unius est exclusio alterius," is a well-established rule of construction and, if its limitations are observed, has a firm foundation in common sense. See T.I. M.E., Inc. v. United States, 359 U.S. 464, 471, 79 S.Ct. 904, 3 L.Ed.2d 952 (1958); Ford v. United States, 273 U.S. 593, 611–612, 47 S.Ct. 531, 71 L.Ed. 793 (1927). In a case such as this, where inclusions and omissions form such a definite pattern, it obviously applies, and leads directly to the conclusion that the provisions of Part II, dealing with through motor-rail routes and rates, were intended to be exclusive.

The Commission does not attempt to meet directly the arguments set forth above, but proposes a counter-argument, that "there is nothing in the statute authorizing the establishment of joint motor-rail rates which relieves a rail carrier joining in such rates from the provisions of section 4. * * * [H]aving voluntarily entered into such a joint arrangement, the motor carrier assumes obligations similar to those of the participating rail carrier in the observance of the provision of section 4." Motor-Rail-Motor Traffic in East & Midwest, 219 ICC 245, 271–72 (1936), quoted in the decision here appealed from, 326 ICC 453, 457 (1966). A silent premise in this argument is that it would be impossible to apply Section 4(1) only to the rail portion of a joint rail-motor service. That premise is correct. A joint rate for a through route under Part II, 49 U.S.C. § 316(c), is negotiated by the carriers involved, and only the total charge presented to the shipping public is subject to general tariff regulations. The various segments of joint or combination rates for through routes are not legally comparable to open tariffs for service between intermediate points, cf., Hocking Valley Ry. v. Lackawanna Coal & Lumber Co., 224 F. 930 (4th Cir.

1915), and the relationships between the participating carriers are regulated under statutory provisions separate from those governing the relationships between carriers and shippers. For example, compare 49 U.S.C. §§ 3(1), 316 (d) with 49 U.S.C. § 3(4). See also St. Louis Southwestern Ry. v. United States, 245 U.S. 136, 139 n. 2, 38 S.Ct. 49, 62 L.Ed. 199 (1917). The major reason for the distinctions is that the Interstate Commerce Act is designed for the protection of the shipping public and of the carriers only insofar as necessary to protect the public so that the only significant unit of measurement under Section 4(1) is the total charge to the shipper. The Motor Carrier Act of 1935 changed the status of motor carriers vis-a-vis regulated rail carriers, from shipper to connecting carrier. Thus, it would be legal and economic nonsense to apply Section 4(1) only to the rail portion of a joint rail-motor operation; in such a case either the rail portion must be excluded or the motor portion included in the coverage of the provision. This is the simple dilemma in which the Commission found itself in the Motor-Rail-Motor Traffic case in 1936. As this full discussion of it shows, however, there is nothing in the law which compels the joint rates to be treated as a unit to compel their treatment under Section 4(1). As shown earlier, the entire thrust of Parts I and II, when read together, points to the contrary conclusion. The exclusion of the rail portion of a joint rail-motor operation from Part I is inherent in its inclusion under the comprehensive provisions of Part II, while there is nothing to indicate that the motor carrier portion was to be included in any provision of Part I. The Commission's need to find that the motor carrier "assumes" the obligations of Section 4 shows the strain which its interpretation puts upon the language of the statute. If a motor carrier is "any common carrier subject to this part [Part I]" under Section 4(1), then it must be a common carrier subject to Part I under Sections 1(4), 1(6), 1(7), 1(9), 1(11), 2, 3(1),

3(4), 5(1), 6(1), 6(2), 6(5), 7, 8, 9, 10 (1), 10(2), and to other sections by implication. A casual reference to these provisions of Part I shows the absurdity of such an argument. Yet this would appear the inevitable result of a holding that a motor carrier, by entering into a joint arrangement with a railroad, assumes the obligations of Part I. However, when Congress intended to exclude a carrier such as a water carrier specifically covered by Part I it did so by defining the carrier as a "carrier by railroad" (e. g., Section 1(16)), and where it desired to exclude a railroad carrier and limit the provision to a "carrier by water" it so provided (e. g., Section 5(1)), and where it intended the term "carrier" to include a motor carrier it made specific provision to that effect. Section 5(13). Moreover, there are numerous references to motor carriers and restrictions in connection with their acquisition by railroads in Section 5 of Part I.

While the precise question raised herein has not been the subject of prior judicial determination, the courts have consistently refused to rewrite the Interstate Commerce Act by the cross-application of sections of one Part to another Part or by expanding by implication the application of any section to carriers other than the one for which the particular Part of the Act was framed, in the absence of clear and unequivocal provision by Congress.

In T.I.M.E., Inc. v. United States, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1958), a shipper of goods by motor carrier attempted to challenge in post-shipment litigation the reasonableness of the carrier's charges which were made in accordance with the tariff governing the shipment, claiming that a right of action to recover the unreasonable rates was granted by implication under Sections 316(b) and (d) of Part II (The Motor Carrier Act) which imposed a duty not to charge or collect other than reasonable rates. The Court, pointing out that while the provisions of Part I, and their counterparts in Part III, gave such a right of action, noted that such provisions were conspicuously absent in Part II and refused to find such provisions therein by implication.

In Consolidated Freightways, Inc. v. United Truck Lines, Inc., 216 F.2d 543 (9th Cir. 1954), cert. denied, 349 U.S. 905, 75 S.Ct. 582, 99 L.Ed. 1242 (1955), the plaintiff motor carrier sued defendant motor carrier for money damages because the latter had been transporting property over a route for which, unlike plaintiff, it had not been certificated.

"In oral argument appellant urged that Part I of the Interstate Commerce Act, the original Act, and Part II of the Interstate Commerce Act, the Motor Carrier Act of 1935, must be regarded as one piece of legislation on the theory that Part II is merely an amendment of Part I and as such necessarily 'incorporates', i. e., assimilates, the provisions of Sections 8 and 9 of Part I, 49 U.S.C. §§ 8 and 9. [Note omitted.]

"We do not agree with the theory advanced in the preceding paragraph. As we have indicated above, Part II makes provision only for criminal penalties and injunctive remedies to be sought by the Commission. In contrast with Part I, Part II is silent as to any private remedy for a violation of any of its provisions. This omission is significant, and persuades us that Part II is to be regarded as a wholly independent legislative enactment in which Congress deliberately elected to provide no remedies for violation of any of its provisions other than those carefully spelled out in Part II itself." Id. at 545.

In McFaddin Express, Inc. v. Adley Corporation, 363 F.2d 546 (2d Cir.), cert. denied 385 U.S. 900, 87 S.Ct. 206, 17 L.Ed.2d 132 (1966), plaintiffs, an interstate motor carrier and its stockholders, attempted to impose liability upon another carrier for a violation of Section 5(4). A majority of the court held that in the absence of provision in Title II, no private right of action against a motor carrier for violation of that section existed. This conclusion

was reached in spite of the fact that Section 5(13) defines motor carriers as within the term "carrier" as used in paragraphs (2)–(12) of Section 5 and 'hence it can be said with verbal accuracy that violation of § 5(4) of a motor carrier is a violation by a 'carrier subject to the provisions of this chapter' within the terms of §§ 8 and 9." 363 F. 2d at 548–549. Furthermore, the conclusion was reached despite the prior passage of the Act of September 6, 1965, 79 Stat. 648, which amended § 204a to grant a right to reparation for unreasonable or discriminatory charges by motor carriers, and added a new section 222 (b) (2), giving a private right of action to enjoin "clear and patent violation" of the licensing requirements. Id. at 549.

The clear separation of the various Parts of the Act has not escaped judicial notice. In Atchison, Topeka and Santa Fe Railway Co. v. United States, 244 F. Supp. at 964–965, the Court noted that:

"The internal structure of the Interstate Commerce Act itself bears evidence of the limited authority conferred on the carrier. Each mode of transportation is the subject of a separate formal part of the Act: part I deals with rail carriers; part II with carriers by motor vehicle; part III with carriers by water; and part IV with freight forwarders. The certificate of public convenience and necessity or license appropriate for each mode of transportation is, by its terms and by the internal logic of the legislation, confined to transportation by that mode. Thus the certificate issued to a motor carrier constitutes a formal determination of the public need for motor transportation, regardless of the availability of other modes, and authorizes the holder to engage in for-hire transportation by 'motor vehicle', not by rail or other modes, and on the 'public highway.'

"When operation by another mode is permissible, specific legislative exceptions have been created. Thus freight forwarders under part IV are specifically authorized to ship goods by means of common carriers governed by other parts of the Act. Such special exceptions mirror the underlying statutory scheme that limits the carrier in each mode to transportation within and by that mode, absent special exception.

"These elementary observations make plain the legislative plan that motor carriers shall perform their authorized services by motor vehicle unless shipment by other modes is permitted by some specific statutory exception. The only relevant statute which allows such substitution is Section 216(c) of the Act. It provides:

" '(c) Common carriers of property by motor vehicle may establish reasonable through routes and joint rates, charges and classifications with other such carriers or with common carriers by railroad and/or express and/or water * * *. In case of such joint rates, fares, or charges it shall be the duty of the carriers parties thereto to establish just and reasonable regulations and practices in connection therewith, and just, reasonable, and equitable divisions thereof as between the carriers participating therein which shall not unduly prefer or prejudice any of such participating carriers. * * *'

"It is agreed on all sides that this provision is permissive. In declaring that carriers 'may establish' through routes and joint rates, Congress left the matter to voluntary agreement, and did not empower the Commission to require such cooperation or coordination. This literal interpretation of Section 216(c) is reinforced by comparison with other provisions of the Act which, as between other classes of carriers, authorize compulsory through routes by Commission order. [Notes omitted.]"

Although it seems clear that Section 216(c) is permissive as to both joint all-motor and joint rail-motor routes and rates, if Part I and Part II may be cross-referenced without legislative authority,

then Sections 3(4) and 15(3) of Part I may be cross-referenced and applied against both modes and a rail carrier, having entered into a joint rate with a motor carrier would, under Section 3(4) be obligated to join in the same rates with any other motor carrier, although the Commission has expressly concluded otherwise. Movement of Highway Trailers by Rail, 293 I.C.C. 93, 105 (1954) (New Haven case).[5]

There is much discussion in the briefs of the legislative history of Section 216 (c) of Part II, which contains the provision authorizing joint motor-rail tariffs. In 1928, 1932 and 1934 the Commission recommended to Congress that it authorize joint motor-rail tariffs and each recommendation specifically provided that such tariffs be subject to the present Part I. The reason for such recommendation is clear. In 1928 at least the Commission recognized that the provisions of Part I would not apply to transportation partly by railroad and partly by motor. None of the recommendations was acted upon by Congress. When the Motor Carrier Act of 1935 was passed it authorized joint tariffs but without express reference to Part I. From these facts the plaintiffs infer that Congress considered placing joint tariffs under Part I and deliberately rejected the idea. The Commission argues that the earlier recommendations were connected with bills or proposals substantially different from the statute finally enacted and that there was never any discussion by the legislators on the record concerning the reasons for omitting the cross-reference. Under these circumstances, the Commission may be correct in saying that no

great significance can be attached to the omission. On the other hand, the legislative inaction which the Commission cites in its favor, i. e., the failure of Congress to reverse the Commission's 1936 decision, is subject to the same comment —it has not been debated in Congress, no reason for it has been stated by Congress, and it has not been subject to independent vote. Thus, if the prior legislative history does not negate the Commission's claim that joint motor-rail tariffs are subject to Part I, the inaction of Congress after the Commission's 1936 decision certainly does not substantiate that claim.[6]

On the other hand, the legislative history cited by an intervening defendant, The Port of New York Authority, does show clearly the reasons why motor carriers were not made subject to Section 4(1). The statements quoted come down to the fact that the number of motor carriers and the variety of their routes and services (1) provide competitive pressures which make the provision less necessary than it is for railroads, and (2) would place an undue administrative burden upon the carriers and the Commission. The point which defendants disregard is that these same considerations are also applicable in part to TOFC services. For example, Plan I and sometimes Plan V TOFC rates are set at levels competitive with all-motor shipments rather than with other rail services. See Substituted Service, 322 ICC 301, 304 (1964); Motor-Rail-Motor Traffic in East and Midwest, 219 ICC 245, 270 (1936). Furthermore, although TOFC services must be routed through specially equipped rail terminals, they are not lim-

---

5. The ICC later held that railroads must allow common carriers by motor vehicle to use open-tariff TOFC services under Sections 2 and 3(1), 49 U.S.C. §§ 2, 3(1), Substituted Services, 322 ICC 301, 327–37 (1964), but this decision was held to be contrary to the statute. Atchison, Topeka and Santa Fe Railway Co. v. United States, 244 F.Supp. 955 (N.D.Ill.1965), probable jurisdiction noted, American Trucking Ass'n Inc. v. Atchison T. & S. F. Ry. Co., 384 U.S. 902, 86 S.Ct. 1337, 16 L.Ed.2d 356 (1966).

6. Indeed, the most likely reason for Congressional silence over the past thirty years is the absence of pressure from the carriers themselves. The reason for abstention was a practical one. The real growth of TOFC service did not start until ten years ago, Substituted Service, 322 ICC 301, 305–09 (1964), so the burden imposed by the application of Section 4(1) has not been sufficient until now to warrant an appeal to the courts or, a fortiori, to the legislature.

ited to places contiguous to rail lines. Thus, competition in joint rail-motor transportation is more like that in all-motor transportation than in all-rail transportation. With regard to motor carriers, Congress clearly found that the need for flexibility and speed in setting rates to meet competition without undue delay or administrative burdens outweighed any regulatory purpose that the application of Section 4(1) would serve. While certain economic considerations apply to motor-rail transportation which do not apply to all-motor transportation, particularly the high ratio of fixed costs to variable costs which makes long-and-short haul discrimination profitable, Locklin, Economics of Transportation, 469, 488 (6th ed. 1966), the competitive conditions of motor-rail operations, in addition to the Commission's powers under Part II of the Act, remove much of the incentive for discrimination unjustified under established principles for Section 4 relief. See Louisville & Nashville Railroad Co., I ICC 31 (1887); Locklin, supra at 480–82. Thus, consideration of the economic factors which Congress has deemed to control the application of Section 4(1) does not bar the interpretation given above, but confirms it. The Commission's interpretation, on the other hand, would unnecessarily hinder legitimate competition contrary to National Transportation Policy and increase the rigidity of transportation rates.

The defendants attempt to justify the Commission's ruling as a matter of policy on the ground that a contrary ruling would render Section 4 entirely ineffective, allowing railroads to avoid its requirements at will merely by tacking a short motor haul to any rail haul in the form of a joint service. In effect, the defendants charge that the railroads would try to use the exclusion of joint motor-rail services from Section 4(1)

illegitimately and without any other justification than the evasion of that provision. Whether railroads would take such action is, however, highly speculative, and such speculation has little weight as against the existing and increasing burden placed upon the transportation system by the present application of Section 4(1).[7] Furthermore, the differences between competition in all-rail transportation and joint motor-rail transportation which justify the exclusion of the latter from Section 4(1) requirements arise chiefly in cases where the motor portions are line hauls, so the danger of evasion would seem most likely in cases where both the origin and destination of the through routes are in terminal areas of the railroad and could be served under Plan II. The Commission has considered such cases and determined that Plan I and Plan V services are permitted, Substituted Services, 322 ICC 301, 355–61 (1964), but for purposes of Section 4(1) it may establish a rebuttable presumption that they are railroad terminal services under Section 202(c) (2) of the Act, 49 U.S.C. § 302 (c) (2), and thus subject to Section 4(1). Thus, specific remedies might be developed for specific areas of abuse, rather than using the Commission's shotgun approach.

The defendants also contend that under the provisions of Part II the Commission can, upon complaint, stay the effective date of a tariff for only seven months. If seven months is not sufficient time for proper administrative adjudication, the remedy is an amendment of Section 316(g) by Congress, not the indiscriminate imposition of indefinite administrative delay upon carriers and shippers by the Commission.

The plaintiffs are entitled to a judgment setting aside and annulling the order of the Interstate Commerce Com-

---

7. For the period October 1, 1964 through October 31, 1965, 159 out of 753 (21%) of the applications for relief from Section 4 involved Plan V rates. None was protested and none was denied. Application of Section 4 Requirements to Joint Motor-Rail Rates Established Under Section 216(c), 326 ICC 453, 474 (1966) (Vice Chairman Tucker, dissenting). See also note (4), supra.

mission and permanently enjoining the enforcement and operation thereof.

Settle judgment on notice.

I am authorized to state that Judge TENNEY concurs in the foregoing opinion.

FRIENDLY, Circuit Judge (dissenting):

My brothers' able opinion does not convince me that the language of the Interstate Commerce Act is so clear as to require us to overturn the administrative construction of the long and short haul clause made in Motor-Rail Motor Traffic in East and Midwest, 219 I.C.C. 245 (1936), consistently followed by the Commission,[1] and relied on by the transportation industry, users of its services and Congress over three decades, even though five members of the agency have now been persuaded that their predecessors were in error.

The basic command of § 4(1) of the Interstate Commerce Act is:

"It shall be unlawful for any common carrier subject to this part or part III to charge or receive any greater compensation in the aggregate for the transportation of passengers, or of like kind of property, for a shorter than for a longer distance over the same line or route in the same direction, the shorter being included within the longer distance, or to charge any greater compensation as a through rate than the aggregate of the intermediate rates subject to the provisions of this part or part III, but this shall not be construed as authorizing any common carrier within the terms of this part or part III to charge or receive as great compensation for a shorter as for a longer distance".

Even if we were to approach the issue in the literal manner of the majority, I fail to see why this language would not cover the cases here before us. Section 1(1) says, so far as here material, that the provisions of Part I shall apply to common carriers engaged in the transportation of passengers or property "wholly by railroad, or partly by railroad and partly by water when both are used under a common control, management, or arrangement for a continuous carriage or shipment" from one state to another, or from any place in the United States to another through a foreign country, or from or to any place in the United States to or from a foreign country. No argument is needed to show that the New York Central and the Pennsylvania are such carriers. The higher rates for the shorter hauls held by the Commission to violate § 4(1), the Central's rate between Louisville, Ky. and New York, N. Y., and the Pennsylvania's between Kearney, N. J. and Indianapolis, Ind., are all-rail Plan II rates. The basis for the railroads' claim of inapplicability of the fourth section is that the lower rates for the longer hauls in which they participate are joint rail-motor rates, and thus not for transportation "wholly by railroad." But the statute does not say they have to be. Section 4(1) reads on *carriers* subject to Part I or Part III, not on *transportation* subject to these parts. To be sure, the statute could not reasonably be construed to cover the relationship of two intrastate rates or, as the Commission has held, even to ban an intrastate rate higher than an interstate rate to a farther point. See Producers Refining Co. v. Missouri, K. & T. Ry., 80 I.C.C. 339 (1923); Tuffli Bros. Pig Iron & Coke Co. v. Southern Pac. Co., 200 I.C.C. 151 (1934). The Act is concerned only with protecting interstate commerce. But, however the case might stand if the rate to the prejudiced point was a joint rail-motor rate and the lower rate to the farther point was all rail or, more pertinently, if both were joint rail-motor rates, I fail to see why the language is not broad enough to

1. See Joint Motor-Rail Rates on Lumber from Savannah, Tenn., 220 I.C.C. 275 (1937); Motor-Rail Rates of Chicago G. W. R.R., 231 I.C.C. 273 (1938); Texas & Pac. Motor-Rail Rates, 279 I.C.C. 135 (1950); and Autos, Barge Proportional from Evansville to Guntersville, 297 I.C.C. 251 (1955).

cover any arrangement whereby a railroad participates in a lower interstate rate to a more than to a less distant point "over the same line or route in the same direction." [2]

If application of § 4(1) had to rest on § 1(2) which makes Part 1 also applicable "to such transportation," namely, the transportation defined in § 1(1), a different result might indeed follow. But it does not. A provision of the Act may apply either because a carrier is engaged in a defined type of transportation or because particular transportation comes within the coverage.[3] Examina-

tion of Part I shows that some provisions apply to carriers subject to that part, some to transportation subject to it, and some only when both the carrier and the transportation are within it. For example, § 2 applies only when "any common carrier subject to the provisions of this part" engages in the forbidden conduct "in the transportation of passengers or property, subject to the provisions of this part," and the prohibitions of § 6(7) are directed at "the transportation of passengers or property, as defined in this part." In contrast § 3(1), like § 4(1), is directed to "any

[2]. It should be emphasized that the instant case presents two examples of classical long and short haul rate discrimination. For instance, the New York Central does essentially the same work under Plan II (all rail) when it transports goods from Louisville to New York City as it does under Plan V (rail-motor). But under Plan V the goods are then hauled an additional distance while the total charge to the shipper is less than for the shorter haul under Plan II. This is the obvious kind of discrimination, seemingly "entirely indefensible and contrary to common sense," Locklin, Economics of Transportation 468–69 (5th ed. 1960), in the absence of competition or other justification, at which § 4 is clearly directed. It is unnecessary here to consider whether that section would also apply in the event the shorter all-rail haul, for which more was charged than for the longer motor-rail haul, involved different and perhaps more expensive operations on the part of the railroad than the motor-rail routing. Such a case might arise, for example, if the route from A to B were from A to A' on a main line with the necessity of rerouting cars destined for B at A' and thence along a branch line; the motor-rail route from A to C were from A to A' by rail and thence by truck through B and on to C; and, because of efficiencies in trucking goods from A' through B to C as compared to rerouting the goods by rail from A' to B and thence by truck to C, the motor-rail rate from A to C was less than the all-rail rate from A to B. In such a case the shorter haul might arguably not be "over the same line or route in the same direction" within the meaning of § 4.

[3]. Section 1 of the Act of 1887 made the statute applicable to
"carriers engaged in the transportation of passengers or property wholly by

railroad, or partly by railroad and partly by water when both are used, under a common control, management, or arrangement, for a continuous carriage or shipment, from one State or Territory of the United States, or the District of Columbia, to any other State or Territory of the United States, or the District of Columbia, or from any place in the United States to an adjacent foreign country, or from any place in the United States through a foreign country to any other place in the United States, and also to the transportation in like manner of property shipped from any place in the United States to a foreign country and carried from such place to a port of transshipment, or shipped from a foreign country to any place in the United States and carried from such place from a port of entry either in the United States or an adjacent foreign country: *Provided, however,* That the provisions of this act shall not apply to the transportation of passengers or property * * * wholly within one State, and not shipped to or from a foreign country from or to any State or Territory as aforesaid." 24 Stat. 379.
Only minor changes in this definition were made by the Hepburn Act, 34 Stat. 584 (1906), and the Mann-Elkins Act, 36 Stat. 544 (1910). Transportation Act, 1920, 41 Stat. 474, altered the scheme. It provided that the Act should apply both, § 1(1), to carriers engaged in defined types of transportation and, § 1(2), to "such transportation." The clause beginning "and also" was omitted; the limiting phrase "but only insofar as such transportation * * * takes place within the United States" was inserted in both § 1(1) and § 1(2), and the old proviso was moved into § 1(2) (a).

common carrier subject to the provisions of this part," and a decision not unknown to fame held it immaterial that prejudice worked by such a carrier on interstate traffic was caused by transportation not subject to the Act because of its intrastate character—and this despite the proviso as to intrastate traffic in the first section, see note 3, supra. Houston, E. & W. Texas Ry. Co. v. United States, 234 U.S. 342, 355–360, 34 S.Ct. 833, 58 L.Ed. 1341 (1914). Other provisions directed to the carrier rather than the transportation are § 3(2), providing that "No carrier by railroad and no express company subject to the provisions of this part shall deliver or relinquish possession at destination of any freight or express shipment transported by it until all tariff rates and charges thereon have been paid," and § 7, prohibiting "any common carrier subject to the provisions of this part" from entering into combinations to prevent the carriage of freight being continuous.

My brothers' assumption that we must either allow rail carriers freedom from § 4(1) when the lower rate to the more distant point is rail-motor or bring motor carriers within a variety of provisions of Part I plainly not intended for them poses an unreal dilemma in which I decline to be pinioned. The escape is by holding that § 4(1) does just what it says; it prohibits rail carriers from charging less for a longer haul than for a shorter rail haul regardless of how they perform the longer haul. While the Commission may have been wrong in claiming that a motor carrier by entering into a joint motor-rail rate "assumes obligations similar to those of the participating rail carriers in the observance of the provision of section 4," 219 I.C.C. at 272, it does not follow that by permitting such a joint rate Congress meant to enable rail carriers to offer in that manner a lower rate for the longer than the shorter haul.

Our duty does not stop with the language but requires an endeavor to ascertain what Congress probably intended. "Emphasis should be laid, too, upon the necessity for appraisal of the purposes as a whole of Congress in analyzing the meaning of clauses or sections of general acts." United States v. American Trucking Ass'n, 310 U.S. 534, 542–544, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940). Such an approach is peculiarly necessary in the case of our most venerable regulatory statute which, far from being tightly drafted as my brothers suggest, contains the encrustations of eighty years and slight variations in language the reasons for which, if any there were, are veiled in the mists of history. While the fourth section may be "a detailed, specific, prophylactic regulation," as the court states, it has always ranked high in the esteem of Congress. As the Commission said many years ago, the practice of charging more for the shorter than the longer haul "had become so general and was felt to be such a gross abuse that there was a very general sentiment in favor of putting a stop to it, which found expression in the enactment of the fourth section." I.C.C. Ann.Rep. 38–39 (1897).

Carriage of freight partly by rail and partly by motor existed long before 1935, and although joint rail-motor rates were not allowed, rail carriers were permitted to publish the truck rates beyond their railheads as a matter of information. See Tariffs Embracing Motor-Truck or Wagon Transfer Service, 91 I.C.C. 539, 548–49 (1924). But that alone would have been far from enabling them to do what they claim the right to do here. Taking the Pennsylvania's case as an example, to be able to charge $1.00 per hundredweight for Plan V traffic from Sewaren, N. J. to Zionsville, Ind. while permitting the truckers operating between Sewaren and Kearney, N. J., and Indianapolis and Zionsville, Ind. to earn a profit, the Pennsylvania would have had to publish a tariff substantially less than its regular rate for hauls between Kearney and Indianapolis. But this would have created a problem under § 2, which made it unlawful for any railroad "by any special rate, rebate, drawback, or other device" to "charge, demand, col-

lect, or receive from any person or persons a greater or less compensation for any service rendered or to be rendered, in the transportation of passengers or property, subject to the provisions of this Act, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions". Cf. ICC v. Delaware, L. & W. R. R., 220 U.S. 235, 31 S.Ct. 392, 55 L.Ed. 448 (1911); Seaboard Air Line Ry. Co. v. United States, 254 U.S. 57, 41 S.Ct. 24, 65 L.Ed. 129 (1920). It is true that in Tariffs Embracing Motor-Truck or Wagon Transfer Service, supra, 91 I.C.C. at 549–550, the Commission, over a well-reasoned dissent by Commissioner Aitchison, did authorize a water carrier between New York and New Haven having joint rates with rail carriers from New York to the south to publish a proportional rate from interior Connecticut points lower than the local rate from New Haven in order to meet the all rail rates, contingent, however, on this proportional rate being offered for all truck operators. But we have been cited nothing to show that rail carriers sought to publish proportional rail rates lower than the local rates for use in conjunction with trucks, and there is no reason to believe the Commission would have sanctioned any large scale program of this sort when the obvious effect would have been to permit what in practical effect was a circumvention of the fourth section. In any event there could have been no such arrangements with a single trucker as are here presented. It squares ill with Congress' devotion to the long and short haul principle to suppose that by authorizing joint rail-motor rates, it meant to give rail carriers a franchise thus to charge a lower rate to a more distant point they had not effectively possessed before; as said by Commissioner Freas, "there is no suggestion" in § 216(c), "or in its legislative history, that such a provision was intended to afford a railroad a device by which, merely by joining with a motor carrier for the performance of a short portion of its haul under a joint-rate arrangement, the former could escape the regulatory provisions of the act otherwise applicable to rates maintained by railroads," 326 I.C.C. at 459. The facts in these two cases afford no basis for the majority's expectation that evasion will be largely confined to cases where the motor haul is within the railroad's terminal area.

While it is doubtless true that Plan V TOFC rates must often be set to compete with all-motor rather than other rail services, I fail to follow the conclusion the majority derives from this. Competition with another form of transportation has been the historic reason for charging less for the longer than the shorter haul but ever since the Mann-Elkins Act, 36 Stat. 547 (1910), this has not been a basis for exemption from the fourth section but rather for relief from it. See Intermountain Rate Cases United States v. Atchison, Topeka & Santa Fe R. Co., 234 U.S. 476, 34 S.Ct. 986, 58 L.Ed. 1408 (1914). Neither can I agree that a Plan V service is more like an all-motor service than an all rail service; certainly it is not in cases like these where the bulk of the haul is by rail.

If the proper construction of the statute were more doubtful than I think it to be, the case would be one where the long-established administrative construction would tip the scale. Although my brothers dutifully recite that "a construction made by the body charged with the enforcement of a statute, which construction has long obtained in practical execution, and has been impliedly sanctioned by the reenactment of the statute without alteration in the particulars construed, when not plainly erroneous, must be treated as read into the statute," New York, N. H. & H. R. R. v. ICC, 200 U.S. 361, 401–402, 26 S.Ct. 272, 281, 50 L.Ed. 515 (1906), they give this principle only lip service. Yet the circumstances here are of the sort that make it peculiarly applicable. The controlling

decision, Motor-Rail-Motor Traffic in East and Midwest, 219 I.C.C. 245, 270–272 (1936), was rendered the year after the Motor Carrier Act was passed by a Commission many of whose members had taken an active part in securing the enactment of that legislation and which included three of the ablest and most knowledgeable men ever to have sat on that body,[4] and the decision has been consistently followed, see cases cited supra note 1. If, as the plaintiffs now suggest, the ruling was a patent power-grab, taking by administrative fiat what Congress had deliberately withheld, it is surprising that the railroads did not make their views known then or later. The argument that their long acquiescence lacks customary weight because the Commission generally granted fourth section relief is unimpressive; if the rail carriers had seen in § 216 a convenient way for escaping the fourth section altogether, they would hardly have let the matter pass. In fact they were divided; the claim that rail-motor rates were within the fourth section was advanced by railroads themselves, 219 I.C.C. at 271.

Moreover, while the bearing of silence or even of reenactment can be exaggerated, these considerations are especially appealing here. Congress has frequently modified the fourth section either to approve or to disapprove rulings of the Commission, on two occasions since the Motor Carrier Act was enacted. See 54 Stat. 904 (1940); 71 Stat. 292 (1957). The 1957 amendment, providing that no application for fourth section relief was required when a carrier operating over a circuitous route wished to meet the charges of a carrier operating over a more direct route, is particularly significant; it was based on a desire to avoid paper work that was generally superfluous since almost all such applications were granted, H.R.Rep. No. 577, 85th Cong. 1st Sess., in 2 U.S. Code Cong. & Adm.News, pp. 1301–1303 (1957)—the very point urged by the railroads against having to seek fourth section relief when the motor-rail rate to the farther point is lower than the all-rail rate to the nearer one. On the other hand Congress declined to accept the broader recommendation of the Secretary of Commerce and the President's Advisory Committee on Transport Policy and Organization that the railroads need not seek prior approval whenever the lower rates for the longer haul "were necessary to meet actual competition and did not result in less than just and reasonable minimum charges," id. at 1306, a proposal that very likely would have covered the cases here before us.

In the light of these considerations I would dismiss the Pennsylvania's complaint.[5] The Central's raises a further point—whether its $1.48 rate on air coolers from Louisville to Trenton via New York does not come within the proviso enacted in 1957:

"That any such carrier or carriers operating over a circuitous line or route may, subject only to the standards of lawfulness set forth in other provisions of this part or part III and without further authorization, meet the charges of such carrier or carriers of the same type operating over a more direct line or route, to cr from the competitive points, provided that rates so established over circuitous routes shall not be evidence on the issue of the compensatory character of rates involved in other proceedings."

4. Commissioners Meyer, Aitchison and Eastman, whose total service was to aggregate 90 years.

5. I find no merit in the argument that even though under both Plan II and Plan V here under consideration the shipper is provided door-to-door service and the rail segments of the hauls are identical, the fact that under Plan V the trucker rather than the railroad is responsible for part of the line haul renders § 4(1) inapplicable. I agree with the Commission that efficiencies realized from the motor carrier's performing certain tasks under Plan V which the railroad is responsible for under Plan II are relevant only in determining whether relief from § 4 shall be granted. See 326 I.C.C. at 466–467.

The issue arose in a curious way. The Central had not raised it before the Commission, evidently desiring to prevail on a broader ground, and it was the Commission that found in its files the Pennsylvania's $1.48 tariff on the direct line. The Commission then proceeded to rule out an argument the Central had not made, on the basis that the Central's Plan V rail-motor rate from Louisville to Trenton via New York is not "of the same type" as the Pennsylvania's Plan II direct all rail rate. 326 I.C.C. at 467. While this is literally so, it would seem quite arguable that Congress could not have meant its words to be taken so strictly, at least where the only factor rendering the Plan V service a "different type" from that of the competing direct all-rail service is that 60 miles of a 1007 mile haul is by truck instead of by rail. Since this issue was not developed of record, I would remand the Central's case for further consideration on that point.